UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

(HONORABLE KENNETH M. KARAS)

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.: 09 Cr. 424 (KMK) |
| Plaintiff, | |
| v. | |
| JOSE QUINOY, | **DEFENDANT'S NOTICE OF MOTION** |
| Defendant. | **ORAL ARGUMENT REQUESTED** |

TO: PREET BHARARA, UNITED STATES ATTORNEY
SOUTHERN DISTRICT OF NEW YORK

CYNTHIA K. DUNNE, ASSISTANT UNITED STATES ATTORNEY
DAVID J. KENNEDY, ASSISTANT UNITED STATES ATTORNEY

**DEFENDANT JOSE QUINOY'S POST-HEARING MOTION TO DISMISS THE INDICTMENT PURSUANT TO FEDERAL RULE OF CRIMINAL PROCEDURE 12(b)(2) DUE TO THE GOVERNMENT'S INTENTIONAL DESTRUCTION OF EXCULPATORY EVIDENCE AND THE DENIAL OF DEFENDANT'S CONSTITUTIONAL RIGHT TO DUE PROCESS**

ANDREW QUINN, ESQ.
JOHN D'ALESSANDRO, ESQ.
ANTHONY DIFIORE, ESQ.

Quinn & Mellea, LLP
Attorneys for JOSE QUINOY
399 Knollwood Road
Suite 220
White Plains, NY 10603

**TABLE OF CONTENTS**

Preliminary Statement …………………………………………………………… 2

Statement of Facts ……………………………………………………………. 2

Argument ………………………………………………………………………… 3

POINT I …………………………………………………………………………. 3

BY HER INTENTIONAL ALTERATION OF THE TRANSCRIPTS
OF 1D5, AND HER FALSE STATEMENTS AT THE PRETRIAL
HEARING, CONSTITUTES A VIOLATION OF THE DEFENDANT'S
AGENT PENA'S INTENTIONAL AND BAD FAITH DESTRUCTION
OF 1D4, EVIDENCED CONSTITUTIONAL RIGHT TO DUE PROCESS
WHICH REQUIRES DISMISSAL OF THE INDICTMENT …………………. 3

1. THE GOVERNMENT ACTED IN BAD
   FAITH WHEN IT DESTROYED 1D4 ………………………………… 7

   a. Recorder 1D4 was properly formatted and downloaded
      to disc 1D4 by Warrington-Gaskins and returned to
      Pena for preservation as evidence ………………………………. 8

   b. Agent Pena switched the disc containing the data
      downloaded on June 6, 2008 with a blank,
      unformatted disc and destroyed the original disc ………………... 10

2. 1D4 CONTAINED APPARENT EXCULPATORY
   EVIDENCE BEFORE IT WAS DESTROYED BY AGENT PENA ..…. 16

3. DEFENDANT QUINOY IS UNABLE TO OBTAIN COMPARABLE
   EVIDENCE BY REASONABLY AVAILABLE MEANS………………. 18

POINT II …..…………………………………………………………………. 19

THE ACTIONS OF AGENT PENA IN THE INSTANT CASE, INCLUDING
THE INTENTIONAL DESTRUCTION OF EXCULPATORY EVIDENCE
AND COVERING UP HER ILLEGAL ACT WITH DECEPTION AND
FALSE STATEMENTS MANDATES DISMISSAL OF THE INDICTMENT ….. 19

1. AGENT PENA COMMITTED A CRIME WHEN SHE DESTROYED 1D4 AND PROVIDED FALSE TESTIMONY TO HIDE HER ACTS. THE GOVERNMENT IS CRIMINALLY CULPABLE FOR THE LOSS…………………………………………….. 21

2. THE DESTROYED EVIDENCE WAS SIGNIFICANT TO THE DEFENSE OF QUINOY; IT DIRECTLY RELATED TO A CRITICAL ISSUE IN THE CASE; THE ILLEGAL ACTS OF AGENT PENA TAINTED ALL OF THE EVIDENCE IN THE CASE ……………………………………………. 26

CONCLUSION ………………………………………………………………. 29

## PRELIMINARY STATEMENT

Defendant Sleepy Hollow Detective Jose Quinoy ("defendant" or "Quinoy") moves this Court for dismissal of the instant indictment on the ground that FBI Agent Catherine Pena intentionally and illegally destroyed exculpatory evidence, specifically Government Exhibit 1D4; that Agent Pena attempted to cover up her illegal act by improperly altering the transcript of Government Exhibit 1D5 to delete any reference to 1D5/1[1], which contained conversations which confirmed that 1D4 contained exculpatory evidence to which the defendant was entitled; that Agent Pena lied to federal prosecutors about the existence and content of 1D4 and 1D5/1, in a failed attempt to keep them from learning of her illegal conduct; that Agent Pena engaged in a two year course of deception and falsehoods in an attempt to cover up her illegal activity; and that Agent Pena lied during the pretrial hearing on this matter, while under oath, by providing false information to the Court, the Government, and the defendant in an attempt to conceal her illegal actions. In short, Agent Pena's criminal actions have tainted the entirety of the Government's investigation and subsequent indictment of the defendant. The only sanction which this Court should impose is dismissal of the entire indictment against the Defendant.

## STATEMENT OF FACTS

The Court is respectfully referred to the Statement of Facts contained in the Defendant's Motion to Sever for a recitation of facts relevant to the counts contained in the Indictment. Insofar as the instant Motion to Dismiss addresses evidence elicited at the hearing conducted on May 17 through May 20, 2010, the Court is respectfully referred to the transcript of the proceedings. Relevant portions of the transcript of the hearing are referred to below.

[1] "1D4" refers to the entire recording, as identified by the government; the symbol "1D4/1" refers to the session contained on the referenced recording.

## ARGUMENT

## POINT I

## AGENT PENA'S INTENTIONAL AND BAD FAITH DESTRUCTION OF 1D4, EVIDENCED BY HER INTENTIONAL ALTERATION OF THE TRANSCRIPTS OF 1D5, AND HER FALSE STATEMENTS AT THE PRETRIAL HEARING, CONSTITUTES A VIOLATION OF THE DEFENDANT'S CONSTITUTIONAL RIGHT TO DUE PROCESS WHICH REQUIRES DISMISSAL OF THE INDICTMENT.

The Second Circuit has long recognized that the destruction of evidence by the government may deprive a defendant of his constitutional right to a fair trial and due process. *United States v. Rahman*, 189 F.3d 88, 139 (2d Cir. 1999); *Buie v. Sullivan*, 932 F. 2d 10 (2d Cir. 1990). See also *United States v. Bin Laden*, No. S(7) Cr. 1023 (LBS). 2001 WL 30061 (S.D.N.Y. January 2, 2001); *United States v. Bielli*, No. 08 Cr. 381 (ADS), 2010 WL 1133862 (E.D.N.Y March 26, 2010); *United States v. Scaretta*, 111 F.3d 124 (E.D.N.Y. 1997). In order for a criminal prosecution to comport with the prevailing notions of fairness, due process requires that the Government disclose exculpatory evidence material to the guilt or innocence of the defendant. *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *United States v. Shine*, 2007 WL 2745351 (D.Vt. 2007)).

The Second Circuit, like most circuits, analyzes the Government's destruction of evidence differently than the suppression of evidence in violation of *Brady*. Specifically, "[w]henever potentially exculpatory evidence is permanently lost, courts face the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed. Moreover, fashioning remedies for the illegal destruction of evidence can pose troubling choices [such as] barring further prosecution or suppressing the [government's] most probative evidence". *California v. Trombetta*, 467 U.S. 479, 486 (1984).

The Supreme Court has differentiated instances in which the prosecution fails to disclose exculpatory evidence in its possession from those in which the prosecution destroys evidence. See

Arizona v. Youngblood, 488 U.S. 51, 57 (1988); California v. Trombetta, 467 U.S. 4797 (1984).

The imposition of sanctions on the government for destroying evidence depends on the prejudicial effect of the loss on the defendant and the government's culpability. United States v. Rahman, 189 F. 3d 88, 139 (2d Cir. 1999). As a threshold requirement to imposing sanctions for destroyed evidence, the destruction must be "chargeable to the government". Rahman, 189 F. 3d at 139 *quoting* Colon v. Kuhlmann, 865 F.2d 29, 30 (2d Cir. 1988). In the instant case, there can be no question that the Government destroyed 1D4. As set forth in detail below, 1D4 contained data – three conversations lasting nearly two and one half hours - when it was turned over to Agent Pena. Thereafter, Pena removed the original from evidence and replaced it with a disk that contains no data. The disc containing the 1D4 data has never been produced by the government. Clearly, that is destruction "chargeable to the government". Id. at 139.

The Second Circuit has repeatedly held that the government's loss or destruction of evidence constitutes a deprivation of a defendant's constitutional right to due process where the evidence shows that: (1) the government acted in bad faith in losing or destroying the evidence, Arizona v. Youngblood, 488 U.S. 51, 56-58 (1988); (2) the evidence had exculpatory value that was apparent before it was destroyed or lost, California v. Trombetta, 467 U.S. 479, 489 (1984); and (3) the defendant is unable to obtain comparable evidence by other reasonably available means. Id. Buie v. Sullivan, 923 F. 2d 10 (2d Cir. 1990). See United States v. Bin Laden, No. S(7) Cr. 1023 (LBS), 2001 WL 30061 (S.D.N.Y. January 2, 2001); United States v. Bielli, No. 08 Cr. 381 (ADS), 2010 WL 1133862 (E.D.N.Y March 26, 2010); United States v. Scaretta, 111 F.3d 124 (E.D.N.Y. 1997); United States v. Kerr, N. 5-09 Cr. 0106 (GTS), 2009 WL 4506293 (N.D.N.Y Nov. 25, 2009).

In the instant case, as set forth below, each of the above-stated elements has been met.

First, the actions of Agent Pena in destroying 1D4 was undertaken in bad faith – her actions not only in destroying the evidence, but her attempts to conceal the transcript of 1D5/1, her failure to notify the prosecution team of her actions, and her false testimony regarding 1D4's production and maintenance, solidly establish that she intentionally and willfully switched 1D4 with the disc contained in the ELSUR envelope – an unformatted dupe - to deny defendant access to the evidence contained thereon. Second, it is incontrovertible that 1D4 contained exculpatory evidence before its was destroyed – at the very least, 1D4 session 3 contained a conversation between Hayes and D'Alessandro wherein D'Alessandro stated that he did not see defendant assault Gomez, and that Gomez was put in the RMP head first - a body position that flat contradicts Hayes testimony that he saw defendant kick Gomez in the head after he was placed in the RMP. Indeed, D'Alessandro was standing directly adjacent to Quinoy and was holding Gomez at the exact moment when Hayes claims to have seen Quinoy punch Gomez twice – thus, he was in the best position to corroborate Hayes' story - if it were true - and he did not. Third, defendant is unable to obtain comparable evidence by other means: 1D4 has been illegally destroyed, and no other copy exists, inasmuch as Pena destroyed them also. While defendant may be able to recreate the Hayes/D'Alessandro conversation at 1D4/3, he cannot recreate the rest of 1D4, which clearly contained unintentional data which Agent Pena believed was so damaging to the government's case that she risked her career to destroy it.

## 1. <u>THE GOVERNMENT ACTED IN BAD FAITH WHEN IT DESTROYED 1D4</u>

The government acted in bad faith when it destroyed 1D4. Indeed, the hearing established that Agent Pena not only destroyed the exculpatory evidence contained on 1D4 consisting of the conversation between D'Alessandro and Hayes (1D4/3), but she willfully destroyed 1D4/1 and

1D4/2, which according to Warrington-Gaskins contained data lasting for 118.13 and 24.05 minutes respectively. The evidence adduced at the hearing further established that Pena's misconduct reached beyond the mere destruction of 1D4 – it consisted of switching the original 1D4 which contained the exculpatory evidence with a blank dupe; forging the handwriting of Gaskins to fool investigators and hide her illegal act; altering the 1D5 transcripts to conceal the importance of 1D4; preventing the USAO and its staff from accessing and thereby discovering the contents of 1D5; providing materially false statements to AUSAs Dunne and Kennedy, as well as other USAO staff and investigators, regarding her actions; and testifying falsely about her illegal acts during the hearings.

**a. Recorder 1D4 was properly formatted and downloaded to disc 1D4 by Warrington-Gaskins and returned to Pena for preservation as evidence.**

The credible evidence adduced at the hearing concerning the creation of 1D4 was provided by Warrington-Gaskins. During her testimony, she provided detailed and credible testimony that the data from every FBIRD given to her unit by Agent Pena was properly and successfully downloaded onto a disc, except 1D4 (T. 320-337); that she would never knowingly put a blank disc into an ELSUR envelope because the FBIRD would be erased, and all data would then be lost (T. 338-39); that she would "take every precaution to ensure that data was properly downloaded and captured on a disc" before erasing the FBIRD, which she did " in every single instance" when she was asked to download data from an FBIRD (T. 339; 344); that she would never knowingly take a disc that contained no data on it and place it in an ELSUR envelope if the FBIRD contained data on it (T. 338-39); that she would never erase information from an FBIRD unless she knew that she had successfully recorded all data from the FBIRD (T. 344); that she would not have erased the data from 1D4 unless she was certain that she had successfully

formatted a disc and copied the data from the FBIRD onto the disc (T. 344-45); that she would spot check the disc to ensure that there was data on the disc (T. 345); that she was "extremely thorough" when spot checking the discs (T. 346); that if the disc wasn't formatted properly, an "error" message would appear on her computer, which didn't occur in this case (T. 347-48); and that she would not put a disc in the ELSUR envelope unless she was "absolutely 100% certain that the data from the FBIRD" was on the disc (T. 331; 363).

Indeed, never before in her career has Warrington-Gaskins created a "blank" disc or a disc that wasn't formatted (T. 352-53; 363). Warrington-Gaskins had no explanation for the blank disc in the ELSUR envelope. (T. 353).

Moreover, all of Warrington-Gaskins' reports indicated that the FBIRD was not blank (T. 361); that the disc upon which she downloaded the data from the 1D4 FBIRD was not blank when she put it in the ELSUR envelope (T. 361; 363); that she has no records which suggest that the FBIRD was blank (T. 361); that her records confirm that the 1D4 FBIRD contained three sessions (T. 361-62); that those three sessions were properly recorded on the worksheet showing the duration and date of each session (T. 342-43); that she successfully downloaded the data from the FBIRD to the disc (T. 363); and that she spot checked the disc before she put it in the ELSUR envelope (T. 363).

Most importantly, based upon her review of her records, Warrington-Gaskins did not tell Agent Pena on June 6, 2008 that the disc was blank. (T. 364). She would not knowingly put a blank disc in the ELSUR envelope. (T. 364). If there was any problem downloading the information from FBIRD 1D4 to a disc, Warrington-Gaskins "would have gone to the next step", i.e., initiated the process of extracting the data from the FBIRD. (T. 364).

In short, the credible and reliable evidence introduced at the hearing established that disc 1D4 contained three sessions when it was placed in the ELSUR envelope on June 6, 2008: the first two of those sessions were unintended recordings the contents of which remains a mystery due to Pena's deception; the third session was exculpatory.

**b. Agent Pena switched the disc containing the data downloaded on June 6, 2008 with a blank, unformatted disc and destroyed the original disc.**

The credible testimony elicited at the hearing established that Agent Pena switched the disc correctly formatted and prepared by Warrington-Gaskins on June 6, 2008 with an unformatted dupe containing no data whatsoever between October 28, 2008 and November 7, 2008.

The testimony of Warrington-Gaskins stands in stark contrast to the testimony of Agent Pena, who testified that Warrington-Gaskins told her that the tape was blank on June 6, 2008 – a claim that Warrington-Gaskins not only denies, but testified that she would *never* do (T. 363-64). Pena testified that she told Dunne and Kennedy about the blank disc "within a week" of June 6, 2008 (T. 544) - testimony that Kennedy flatly contradicts (T. 568; Stip. ¶ 15)[2]. Pena testified that she removed 1D4 from evidence on October 28, 2008, two weeks after the trial team forwarded an email seeking production of all recordings made by Hayes for the purported purpose of "determining whether any evidence was contained on the disc" – despite her utter lack of technical training in the recovery of evidence. Further, Pena testified that she never sought assistance from any technical specialists in "recovering data" from the blank disc, though such experts were available to her. Pena testified that she kept 1D4 out of evidence and in her possession for ten days – October 28 2008 to November 7, 2008 – to see whether she could recover data, although no evidence exists that she sought any assistance in doing so, and despite the fact that such a

determination could have been made in minutes. 1D4 was the only original recording Pena removed from an ELSUR envelope for any reason before May 2010, when the discs were being turned over to the USAO for trial.

Several specific instances of Pena's testimony establish that she was not truthful or honest with the Court.

First, Pena's recollection of the circumstances under which she took 1D4 into evidence changed as the investigation progressed. When initially questioned by the trial team on May 5, 2010, Pena told AUSAs Kennedy and Dunne and FBI Counsel Richard Walsh that the 1D4 FBIRD was blank when the tech first attempted to download it onto a disc (Stip. ¶3). On May 6, 2010, Pena told AUSA's Dunne and Kennedy that when the tech attempted to download data from 1D4 "it was blank, there was no data on the disc" (Stip. ¶6). Pena also told Dunne and Kennedy that the tech gave her the original and two copies (Stip. ¶8); that she in fact had received two copies of 1D4, and threw away the copies "probably because they were blank and she did not see a purpose to keeping the blank discs". (Stip. ¶9). On May 8, 2010, Pena told her immediate supervisor, Agent D'Alonzo, the same thing, to wit: that she had initially received two blank copies of 1D4 from the tech unit, which she discarded because they were blank (T. 703; 706).

Pena changed her account after Agent D'Alonzo met with Pena alone on May 10, 2010 and "told her of the USAO's concerns about her prior statements and actions pertaining to recordings 1D4 and 1D5. For example, they discussed the number of discs that she had received at the time that the received the 1D4 disc from the tech department. Further, [D'Alonzo] shared the substance of paralegal Shannon Becker's statements to the USAO regarding her communications with Pena". (T. 709)(See also Government Letter dated May 14, 2010). Specifically, AUSAs Dunne and

[2] Pena changed her testimony on May 20, 2010, when she testified that she did not state that she notified Dunne and Kennedy within a week. (T. 583). Nevertheless, she confirmed that she would have notified Dunne and Kennedy prior

Kennedy re-interviewed Pena on May 14, 2010. At that interview, Pena told them that when she picked up recording 1D4 from the tech department, she was told that the recording was blank; she only picked up the original disc, which she put in an ELSUR envelope, and did not recall if she picked up the two copies. This statement was a departure from Pena's earlier statements to Dunne and Kennedy that she had received two copies of 1D4 from the tech department. (Stip. ¶11).

During her testimony on May 19, 2010, Pena testified that she wasn't sure if she received two copies of 1D4 from Warrington-Gaskins (T. 558)[3]. Pena also testified that she told Dunne, Kennedy and Walsh that "it was possible that I would have received a disk and two copies" (T. 535); she denied telling them that she affirmatively recalled receiving two copies and an original from the tech (T. 552). Her testimony was materially different from the statements she made to the USAO and FBI Counsel only two weeks earlier. (Stip. ¶ 13) .

Second, Pena's explanations regarding her actions on June 6, 2008 defy all reason, and are entirely inconsistent with the actions of a veteran FBI agent. Specifically, Pena testified that she was aware that the 1D4 disc was blank on June 6, 2008 when she received it from the tech (T. 545); that she did not question the tech when she was told that the disc was blank as to the reasons why it was blank (T. 545); that she did not question the tech to see if data was contained on the FBIRD (T. 546); that she was not even curious whether data was on the FBIRD (T. 546); and that she left the unit knowing that the FBIRD would be scrubbed clean and that she would never get the FBIRD back. (T. 546).

Third, Pena's testimony regarding her decision to put the blank 1D4 disc into the ELSUR envelope is equally incredible. Pena testified that she knowingly put the blank 1D4 disc in the ELSUR envelope, despite knowing that it contained no evidence whatsoever (T. 552); while she

---

to September 2008 (T. 585) – a claim that Kennedy and Dunne still deny (Stip. ¶ 15).

admitted that she was not required to submit the ELSUR envelope to evidence, she claimed that it was "strictly an administrative decision" to keep a record of the information contained on the ELSUR envelope (T. 553); that she did not notate anywhere on the ELSUR envelope that the disc was blank, purportedly because the ELSUR envelope was completed "for my own edification, to keep track of this document" (T. 559); that she put the ELSUR envelope containing a blank disc with no evidence on it into evidence storage because "I didn't want it to get misplaced. I wanted to keep all the ELSUR envelopes together" (T. 553-54); and that the only reason that she logged the blank disc into evidence was to "capture the information that was on the ELSUR envelope" (T. 554). This explanation of her actions is patently ridiculous. There is simply no credible reason why a veteran agent would place a blank disc containing no evidence into an ELSUR envelope, and then log that ELSUR envelope into evidence storage for the sole purpose of keeping track of the evidence envelope. Her testimony was, quite frankly, insulting to the Court.

Fourth, Pena did not report the fact that 1D4 was blank to anyone, despite her own characterization of the contents of 1D4 as "a good one" (T. 540). Remarkably, Pena produced two reports regarding this case on June 6, 2008 – the same date she claimed to learn that the 1D4 disc was blank – yet made no mention of the blank disc in either report. (T. 548-49)(DX HH and II). When asked why, Pena's feeble reply was "I don't know" (T. 549). Pena did testify that, if she learned that an FBIRD disc was blank, she would record that fact in a 302 "in a timely manner". (T. 531). In this case, Pena did not prepare a 302 until November 7, 2008, five (5) months after she allegedly learned that disc 1D4 was blank, and on the same date that she returned disc 1D4 to evidence after removing it nine days earlier on October 28, 2008. (T. 532-33).

Fifth, when confronted with the testimony of Warrington-Gaskins that her unit's protocol

[3] Warrington-Gaskins testified that she routinely gives an original and two copies to the agents after downloading data onto a disc (T. 310-12; 313).

forbids giving an agent a blank disc, Pena relied “I don’t have any explanation. At this point I’m saying obviously my memory is wrong”. (T. 594). When further challenged how she could have received a blank disc, Pena testified “the only possible explanation I can think of is that I’m wrong and I was not told by the tech and I learned it from the copies of the discs maybe. I don’t know. I don’t know”. (T. 595). Obviously, Agent Pena’s attempt to explain her actions fall flat – Warrington-Gaskins testified that she would never give an agent a copy of a blank disc. In any event, because disc 1D4 was unformatted, no copy could have been created. Her testimony is, therefore, impossible to believe.

The only truly provable fact is that the disc found in the ELSUR envelope for 1D4 is unformatted. The original disc was given to Pena with data successfully downloaded by Warrington-Gaskins on June 6, 2008, who placed it in the ELSUR envelope. That same envelope was delivered to evidence storage by Pena three minutes after she received it; she did not listen to it before she submitted it into evidence. On October 28, 2008, Pena removed the disc for ten days for the alleged purpose of trying to retrieve data, despite her complete lack of technical knowledge; she never asked for assistance. That tape is now an unformatted blank. No explanation for the existence of the unformatted disc is possible other than the obvious: Pena switched the disc between October 28, 2008 and November 7, 2008.

To the extent that the government argues that the above-referenced scenario is contradicted by Warrington-Gaskins testimony that her handwriting is on 1D4, that testimony does not withstand scrutiny. Specifically, while Warrington-Gaskins initially testified that her handwriting appears on disc 1D4 (T. 354-55), she also testified that she was never asked to scrutinize the handwriting (T. 354) and that she was essentially told it was her handwriting when she was asked to review the disc initially (T. 354). During the hearing, she was asked *for the first time* to look closely at the

handwriting on disc 1D4 and compare it to other examples of her handwriting. (T.354-358). There are differences in the handwriting contained on disc 1D4 and other exemplars of Warrington-Gaskins' handwriting that are apparent to the untrained eye, most particularly the manner in which the number "8" and number "2" appear on the disc. In any event, once Warrington-Gaskins completed her review of her handwriting and the handwriting on disc 1D4, she could not "testify with certainty" that the handwriting contained on disc 1D4 was hers. (T. 357-58). Given Agent Pena's numerous misrepresentations to the AUSAs assigned to this case, coupled with her patently misleading and evasive testimony at the hearing, it is not surprising that the government has not taken steps to confirm the handwriting on disc 1D4.

A review of the ELSUR envelopes completed by Agent Pena - marked in green highlighter and introduced at the hearing on May 20, 2010 as Defendant's Exhibit 1015, 1017, 1018, 1020, 1021, 1023, 1024 and 1026 - shows a distinct manner in which Pena writes the number "8" on every occasion: she completes the number with an arching curl to the right (T. 651). Warrington-Gaskins completes every "8" with a curve to the left. Similarly, Warrington-Gaskins always curls the top line of number "2", which is not done on disc 1D4. (GX 1016-A). Pena, on the other hand, writes her "8" in a manner identical to the "8" found on disc 1D4. These distinctions are apparent to the untrained eye.

Assuming *arguendo* that Warrington-Gaskins did write on disc 1D4, it would still not explain how the blank unformatted disc was placed in the ELSUR envelope. Specifically, if Warrington-Gaskins placed the unformatted disc 1D4 in the ELSUR envelope, she would have done so *without knowledge* that it was blank. In other words, if Warrington-Gaskins placed the blank disc in the ELSUR envelope, it would have been accidental since she testified that she would never place a blank disc in an envelope – her protocol doesn't permit it (T. 331; 363-64). Thus,

under no circumstances could Warrington-Gaskins have told Pena that the disc was blank, as Pena testified (T. 544).

In summary, Agent Pena's testimony regarding the discovery of the allegedly "blank" 1D4, her failure to make immediate notifications to Dunne and Kennedy once she learned the disc was blank, her explanation concerning the vouchering of what she claims was a blank disc, her removal of disc 1D4 from evidence in October, the failure to prepare a report regarding the blank disc for five months, her changing account of receiving 1D4, and the general nature and evasiveness of her testimony, particularly when contrasted to the testimony of Warrington-Gaskins, compel the conclusion that Pena's testimony was not credible. In short, she lied.

## 2. 1D4 CONTAINED APPARENT EXCULPATORY EVIDENCE BEFORE IT WAS DESTROYED BY AGENT PENA

The evidence contained on 1D4 was intentionally destroyed because it contained information and evidence exculpatory to the defendant. Additionally, Pena and Hayes conspired to keep the contents of 1D4 from the defendant by (1) denying knowledge that 1D5/1 existed and (2) keeping the contents of 1D5/1 from the USAO.

The testimony introduced at the hearing concerning what was known to be on 1D4/3 confirms it was exculpatory: 1D4/3 was a May 24, 2008 conversation between Hayes and D'Alessandro wherein D'Alessandro contradicts Hayes' allegations that defendant assaulted Gomez while Gomez was restrained. (T. 40-43). Hayes testified that he spoke with D'Alessandro at police headquarters on May 24, 2008 while wearing the recording device (T. 40); that D'Alessandro told him that he did not see defendant punch Gomez two times while restrained (T. 43; 115); that he did not see defendant kick Gomez while he was in the rear of the RMP (T. 43); and that he saw Gomez placed in the RMP headfirst, thereby contradicting the "eyewitness" account of Hayes.

Thus, what is known to comprise at least part of 1D4 was clearly exculpatory: the critical eyewitness to the Gomez incident confiding in a friend and fellow officer regarding his observations, without knowledge that his statements are being recorded, and speaking in an atmosphere of confidentiality and complete honesty, denying that the defendant assaulted Gomez while restrained. (T. 40-43; 115).

What is known about 1D4/1 is that it consists of a recording lasting 118.13 minutes; that Agent Pena was in possession of the FBIRD at the time the recording was initiated; that the intended recording was supposed to be a thirty second preamble (T. 612); that the recording was made on May 22, 2008; that Hayes believed that he recorded forty five (45) minutes of unintended conversation (T. 71). If Hayes is correct, the remainder of the unintended capture of 1D4/1 – approximately one hour and twenty minutes - occurred when Pena was in possession of the FBIRD; and that no one but Pena and Hayes know its contents.

The additional data contained on 1D4 that is still unknown due to the actions of Agent Pena. Specifically, Warrington-Gaskins testified that she downloaded three sessions from 1D4 on June 6, 2008: 118.13 minutes; 24.05 minutes and 20.13 minutes. That data has been permanently lost to the defendant. It is respectfully submitted that the contents of 1D4/1 and 1D4/2 were extraordinarily damaging to the government’s case: Agent Pena has jeopardized her career in a poor effort to destroy the contents of 1D4 and cover her tracks.

Similarly, with respect to 1D4/2, Warrington-Gaskins’ reports indicate that she downloaded a 24.05 minute session dated May 22, 2008. The defendant presently knows nothing about that recording – who was on it, what was said, and how it was exculpatory. Because Agent Pena intentionally destroyed 1D4, the defendant cannot establish what was on 1D4/2 – presumably, the data would have damaged the government’s case; otherwise, Agent Pena would not have gone

to such great lengths to destroy it.

### 3. DEFENDANT QUINOY IS UNABLE TO OBTAIN COMPARABLE EVIDENCE BY REASONABLY AVAILABLE MEANS.

Defendant Quinoy is unable to obtain comparable evidence as that which was included on 1D4 inasmuch as the original was switched and now consists of an unformatted blank. To the extent copies of 1D4 ever existed, Agent Pena advised the USAO and her supervisors that she previously discarded or destroyed all copies of 1D4, under the pretense the she believed they were blanks. The government has failed to produce any transcripts of the data contained on 1D4 – no sessions have been turned over to us - and it is the understanding of the defense that no one in the government can recreate the contents of 1D4.

## POINT II

## THE ACTIONS OF AGENT PENA IN THE INSTANT CASE, INCLUDING THE INTENTIONAL DESTRUCTION OF EXCULPATORY EVIDENCE AND COVERING UP HER ILLEGAL ACT WITH DECEPTION AND FALSE STATEMENTS MANDATES DISMISSAL OF THE INDICTMENT

The Second Circuit has long recognized the appropriateness of sanctions against the government in criminal cases where the government failed to preserve discoverable evidence. The Circuit has held that District Courts should "look with an exceedingly jaundiced eye upon . . . efforts to justify non-production of a Rule 16 or Jencks Act statement by reference to a department policy or established practice or the like" and "that where destruction is deliberate, sanctions will normally follow". United States v. Buffalino, 576 F.2d 446, 449 (2d Cir. 1978), *cert. denied*, 4439 U.S. 928 (1978); *accord* United States v. Sanchez, 635 F.2d 47, 65-66 (2d Cir. 1980). As stated by the Second Circuit in United States v. Grammatikos:

> The Government has long been on notice of its duty to preserve discoverable evidence and has been repeatedly warned of the jeopardy in which its places its prosecutions when it disregards this obligation. However . . . sanctions should not be imposed [automatically] on the government for the loss of such material; rather, the appropriateness and extent of such sanctions in such situations depends upon a case-by-case assessment of the government's culpability for the loss, together with a realistic appraisal of its significance when viewed in light of its nature, its bearing upon the critical issues in the case and the strength of the government's untainted proof.

633 F.2d 1013, 1019-20 (2d Cir. 1980); *see also* United States v. Dalisay, No. 03 Cr. 1305 (JGK), 2005 WL 1176115 (S.D.N.Y. May 17, 2005); United States v. Morgenstern, No. 89 Cr. 0693 (RWS), 1990 WL 74552 (S.D.N.Y. May 30, 1990); United States v. Ungar, 648 F. Supp. 1329 (E.D.N.Y. 1986).

In virtually every case where the Second Circuit has considered the imposition of sanctions against the government for the loss or destruction of evidence, the circumstances surrounding the loss of evidence has involved either negligent destruction of evidence, *United States v. Morgenstern*, *supra* at *5 ("government mishandling of documents caused no by deliberate misconduct but unthinking negligence of gross magnitude"); destruction that did not involve any evil intent, *United States v. Grammitokos*, *supra* at 1021 ("the circumstances of the disposal of the tapes tends to refute any suspicions of evil motive or foul play"), *United States v. Bufalino*, *supra* at 450 (destruction of back-up tapes not prejudicial because they were largely inaudible and exceedingly inferior in quality to tapes produced by government); or destruction of evidence done in the normal routine of the agency's business, *United States v. Dalisay*, *supra* at *8 ("there was no deliberate misconduct and the circumstances of the destruction were removed from the agents involved in the investigation"), *United States v. Ungar*, supra at *1336 (routine destruction of documents by non-investigatory agency).

The instant case is different: this case involves deliberate misconduct on the part of the government, where the ultimate goal of the misconduct was to deny the defendant access to and knowledge of exculpatory evidence. District Court Judge Sweet characterized this precise type of misconduct in the destruction of evidence as warranting dismissal of the indictment: "To be sure, [*Morgenstern*] does not implicate 'evil motive of foul play' on the part of the Government, meaning this is not one the those rare instances where dismissal of the indictment is required owing to the deliberate nature of governmental misconduct". *United States v. Morgenstern*, *supra at *5.*

It is respectfully suggested that the actions of Agent Pena in destroying 1D4, and hiding her actions with the complicity of Hayes by altering the transcript of 1D5/1, and then providing false testimony regarding her actions in order to deny the Court, the USAO and the defendant the truth

regarding the evidence, is "one of those rare instances where dismissal is required". *Morgenstern* at *5.

Applying the *Grammitikos* balancing test to the facts of the instant case, it is clear that dismissal of the indictment is the only appropriate sanction.

**1. Agent Pena Committed a Crime When She Destroyed 1D4 and Provided False Testimony To Hide Her Acts. The Government's Is Criminally Culpable For The Loss.**

In the instant case, as set forth in detail in Point I, *infra*, the Government is not only responsible for the loss of 1D4, but Agent Pena and Detective Hayes have attempted to deceive the USAO, the defendant, and this Court - through false testimony and attempts to cover up their misconduct – regarding the circumstances surrounding the destruction of 1D4. Thus, unlike other cases where the Government has a reasonable explanation for the loss of evidence, this case is different: the government is not only culpable, the actions of Agent Pena are criminal.

This is most obviously established by the manner in which Pena attempted to hide the existence of 1D5/1.

On June 24, 2008, Pena forwarded disc 1D5 to the Agency's word processing unit for typing. (Def. Ex. LL). Paliseno was assigned the job on June 30, 2008 (T. 149). She completed the transcript on July 2, 2008 (T. 151). On July 7, 2008, Paliseno sent Agent Pena, *via email*, the first draft of the transcript of 1D5 which consisted of forty-two (42) pages. (T. 156-57; Def. Ex A, pp. A28-A69). Between July 7, 2008 and August 7, 2009 no one other than Agent Pena handled the transcript of 1D5. (See Stip. ¶11)[4].

[4] Both AUSA Kennedy and AUSA Dunne affirm that all references to their notes related to their interviews of Pena are an accurate representation of the statements made by Pena as they were made contemporaneously with the making of said statements. (Stip. ¶ 2).

Hayes testified that he received a copy of the 1D5 transcript from Pena for the purposes of marking it up and editing it. (T. 99-100). He testified that he received the transcript unstapled (T. 100); that when he first received the 1D5 transcript, it did not contain the cover page or the second page containing reference to ".WAV 2" (T. 101); he did not recall seeing that the pages were misnumbered, or that the third page of the transcript he edited was numbered "31". (T. 102); and he was not provided with a transcript of 1D5/1, nor told that one existed (T. 104).

On August 7, 2009, Agent Pena delivered a hard copy of the edited transcript of 1D5 to FBI typist Julie Knapp for a "re-type" (T. 641; DX LL); that hard copy was missing pages 3 through 30. (DX B). Later that same day, at approximately 3:27pm, Knapp emailed Pena and attached the completed 14 page "re-type". (GX 1037). At this point, page #2 of the completed "re-type" of 1D5 still contained Agent Pena's preamble, reference to "WAV #1" and the heading for "WAV #2", which was at the bottom of page 2 of the re-type. Pages three through thirty were now effectively deleted from the transcript: thus, any reference to the 1D4 and "inappropriate" statements made by Hayes were gone, and because the transcript was renumbered, no evidence that the thirty minute conversation between Hayes and Pena existed in the transcript.

Between August 8, 2009 and September 1, 2009 there were no there were no other requests for an FBI typist to revise the transcript of 1D5 and no one other than SA Pena handled the transcript of 1D5. (Stip. ¶11).

On September 1, 2009, Hayes signed as "final" the 14 page transcript of 1D5. (DX I). The transcript that Hayes reviewed and signed on September 1, 2009 still contained Pena's preamble, reference to "WAV #1" and the heading for "WAV #2", which was at the bottom of the page. (DX I).

Between September 1, 2009 and September 28, 2009 there were no there were no other requests for an FBI typist to revise the transcript of 1D5 and no one other than Pena handled the transcript of 1D5. Notwithstanding this fact, on September 28, 2009, Hayes reviewed and signed a second "final" transcript of 1D5 that had been materially altered in that (1) page #2 no longer contained SA Pena's preamble; (2) the transcript no longer contained a reference to "WAV #1"; (3) the heading for "WAV #2", which was previously at the bottom of the page, was changed to read "(Session 2)" and was moved to the top of the page; and (4) the transcript was now 13 pages long. Obviously, since Pena was the only person to handle the transcript of 1D5, she altered the transcript before giving it to Hayes for review and signature. (DX J).

Despite Agent Pena's continued denial of wrongdoing through incredulous testimony, further evidence of her misconduct, attempted cover-up and consciousness of guilt was exposed as follows:

On June 22, 2009, when Agent Pena was asked by AUSAs Dunne and Kennedy for the dates of all recordings in connection with the above-referenced matter, she intentionally failed to disclose the existence of 1D5/1, which was recorded on June 4, 2008. (DX L; pp G9).

On March 5, 2010, Agent Pena misrepresented to the USAO that the "final" transcript of 1D5 only contained thirteen (13) pages and a single recording session when, in fact, the complete transcript of 1D5 actually should have contained forty-two (42) pages and two (2) recording sessions.

Finally, on May 20, 2010, the FBI reported that multiple versions of the transcript of 1D5 were found on SA Pena's computer. Namely, a file named "1D5" which was created on July 22, 2009; and a file named "1D5final" which was created on August 16, 2009. Agent Pena could not

offer an explanation as to why there were so many revised copies of the transcript of 1D5 on her computer, all of which ominously did not contain pages 2-30.

Similarly, Hayes' testimony regarding 1D5/1 is clearly untrue. Hayes testified repeatedly that he was unaware of the unintentional 1D5/1 recording until May 3, 2010, when he was told of it by the government. (T. 46; 81-82). That testimony was patently false – Hayes can clearly be heard on 1D5/1 coughing to check the FBIRD on June 4, 2008 to see if it was on, and then whispering "she did it again". (T. 87-88). When confronted with this evidence, Hayes initially attempted to say that he did not know how long the recorder had been on - another blatant lie (T. 88) but was eventually forced to admit that he knew on June 4, 2008 that he had recorded at least thirty (30) minutes of conversation between himself and Pena (T. 92). Through cross-examination, Hayes was forced to admit that he knew of the unintended capture of his conversation with Pena on June 4, 2008 - a full two years earlier than he testified to. He lied the Court, and was caught doing so by his own voice[5].

To the extent that Hayes testified that he never told Pena about 1D5/1, such testimony is also patently ridiculous and another insult to this Court (T. 89-96). Hayes was forced to admit that he knew about the unintentional 1D5/1 recording on June 4, 2008 (T. 88-89) contradicting his sworn testimony given just minutes earlier (T.87-89). Hayes admitted that he was instructed by Pena to "call me right away" if another inadvertent recording was made (T. 94); he admitted that he was speaking with her "on almost a daily basis" (T. 90-91); he admitted that he met with her three

[5] Hayes simply has no credibility whatsoever. He testified at the hearing that he was on the driver's side of the RMP when he saw defendant kick Gomez in the head. (T. 113). However, he testified in the Grand Jury that he was standing on the passenger side of the RMP when Quinoy assaulted Gomez, which is patently untrue (T. 114). Hayes claimed that his recollection was "rehabilitated" when he reviewed the video of the incident "a couple of weeks ago" (T. 116). That was another lie. Hayes and Quinoy reviewed the video together on April 18, 2008 – two years earlier - the discussion was captured on 1D3/2. Thus, Hayes knew he was on the driver's side of the RMP when he testified in the grand jury. Hayes lied in his police reports about the Gomez incident (T. 118); he lied under oath before a grand jury (T. 114); and he lied at the hearing when he said that he did not know 1D5/1 existed before May 2010 (T. 87-88).

days after 1D5/1 was inadvertently made (T. 90); he knew that 1D5/1 contained the conversation between him and Pena wherein he talked about making "inappropriate" comments and saying "things you shouldn't have said" (T. 92). Yet, he claims that he never told Pena that they were inadvertently recorded on June 4, 2008 and captured on 1D5/1.

The Defense suggests that Hayes repeatedly lied to this Court to protect both himself and Agent Pena. He was aware of the contents of 1D4, and knew that 1D5/1 would lead any competent attorney or investigator to closely inspect the circumstances under which 1D4 was replaced and destroyed. In short, because he told her of 1D5/1 in June 2008, she was aware that she needed to review what was captured on 1D4 closely. Once she heard the contents of 1D4, she improperly decided to destroy it.

In short, the paper trail of evidence established that (1) Pena received a 42 page transcript from Paliseno; (2) she removed pages 3-30 which contained the 1D5/1 conversation wherein she was told by Hayes that he said inappropriate things on 1D4; (3) she gave the transcript without the pages to Hayes (according to Hayes), who edited only 1D5/2; (4) she sent the edited version for a re-type, which altered the page numbers; (5) she received the re-type which still contained reference to 1D5/1 and gave that version to Hayes to sign as a "final" on September 1, 2009; (6) she amended the "final" September 1, 2009 version to delete any reference to 1D5/1; (6) she gave the amended "final" transcript to Hayes, who signed a second "final" draft on September 28, 2009 which contained absolutely no reference to 1D5/1 whatsoever; (7) she kept the existence of 1D5/1 from the USAO until finally being caught by paralegal Shannon Becker on May 3, 2010; (8) attempted to keep Becker from listening to the 1D5 disc by claiming policy would not allow USAO staff from opening evidence without an agent present; and (9) misrepresented the contents of 1D5/1 to Becker by saying that the session consisted of "non-pertinent" information (giving directions to the CW).

### 3. The Destroyed Evidence Was Significant to the Defense of Quinoy; It Directly Related to a Critical Issue In The Case; The Illegal Acts of Agent Pena Tainted All of the Evidence in the Case

Applying the second criteria in the Court's assessment of imposition of sanction, it is apparent that the illegal acts of Pena tainted the entirety of the government's case. She was the lead agent; she was in constant dialogue with Hayes, the only police witness who claims that Quinoy assaulted Gomez while Gomez was restrained. She had constant communication with the civilian witnesses in the case. It is impossible to believe that an agent who went to such extraordinary lengths to destroy evidence that was exculpatory to the defendant would not have tampered with other evidence or compromised the integrity of the entire investigation.

The Second Circuit recognizes that "the extreme sanction of dismissal of an indictment is justified in order to achieve *one or both* of two objectives: first, to eliminate prejudice to a defendant in a criminal prosecution; second, the help translate the assurances of the United States Attorneys into consistent performances by their assistants". *United States v. Fields*, 592 F. 2d 638 (2d Cir. 1978); *see also* *United States v. Jacobs*, 531 F. 2d 87 (2d Cir. 1976), *vacated and remanded*, 429 U.S. 909, *aff'd on remand*, 547 F.2d 772 (2d Cir. 1976), *cert. dismissed*, 436 U.S. 31 (1978)(emphasis added).

In this case, the defendant has established conclusively that the lead FBI agent on his case has tampered with evidence that was exculpatory to him. The Government has essentially taken a *laissez-faire* approach to Pena's misconduct[6]: while the government has certainly responded timely and completely to each of the defendant's requests for materials and evidence in the past two weeks – which clearly evidences the AUSAs willingness to assist the defendant in his quest to find the

[6] It cannot go unnoticed that the government did not call Pena as a witness during the hearing, but rather allowed the defendant to call her. Similarly, the AUSAs made no effort to rehabilitate her testimony during the hearing. Presumably, the AUSAs were aware that Disciplinary Rule 7-102 prohibits n attorney from knowingly using perjured testimony or false evidence. (See DR 7-102; EC 7-26, N.Y. Jud. Law (McKinney 1975).

truth – it appears to the defense that this is a task that should have been undertaken by a governmental law enforcement agency long before this point.

In the instant case, both criteria designated by the Second Circuit are applicable. First, when the governments' culpability in destroying evidence is this great, and so obvious, there is no way to eliminate the prejudice to the defendant. 1D4 remains a mystery: Pena denies hearing the recording, as does Hayes. Clearly, the evidence contained on1D4 was so helpful to the defendant that the government went to great – though obvious – lengths to destroy it. Moreover, given the actions of Pena and Hayes, the integrity of the entire investigation is compromised.

For instance, the evidence produced by the government indicates that Pena was using Hayes to record the defendant prior to him being opened as a confidential human source. Three 302s produced by the government - the earliest reports turned over to the defense regarding Hayes' cooperation - indicate that Hayes and Pena were recording Quinoy before Hayes was officially signed up as a CHS.

Moreover, Hayes was in possession of the FBIRD and surely trying to capture conversations between himself and critical witnesses to the Gomez and Vilches incidents for huge periods of time. The fact that no recordings exist of Officer Ebel, Officer D'Alessandro Officer Bueti and Sgt. Hood is highly suspect. These officers were eyewitnesses to the events under investigation. The government had a fellow police officer as a cooperating witness. Everyone of us who has ever worked in law enforcement knows that when you have a good informant like this you use him for everything you can. It is impossible to believe that the Government would not make every attempt to get information from every one of these officers.

In light of Agent Pena's demonstrated willingness to destroy evidence helpful to the defendant it is highly likely that during these gaps in time, exculpatory conversations with these

officers were captured and subsequently erased by Pena. She merely had to go to the tech's office and ask them to scrub the FBIRD.

In short, from the outset of this investigation Special Agent Pena and Hayes seemingly conspired to violate the Due Process Rights of defendant Quinoy. They sought to interrogate him without the benefit of retained counsel, they destroyed exculpatory evidence, they doctored transcripts to cover up their crimes and then they perjured themselves in this hearing.

The case law suggests that dismissal of an indictment is the most extreme sanction and should be reserved for incidents when the governments withholding of exculpatory evidence is in bad faith. Pena destroyed exculpatory evidence. The trial team suspects this and that is why they never called her to the stand. Pena seemingly forged handwriting and altered transcripts to cover up this crime. The trial team suspects this and that is why they did not call her as a witness nor try to rehabilitate her when she was confronted with proof of her perjury. Pena provided incredible, illogical and disingenuous testimony numerous times throughout this hearing. The USAO knows this and acknowledged by stipulation. If these facts do not rise to the level of egregious bad faith criminal conduct on the part of a government agent, constituting prejudice to the defendant, it is hard to imagine what series of facts that would.

## **CONCLUSION**

Wherefore, the defendant Jose Quinoy respectfully requests that Court dismiss the indictment in its entirety, together with such other and further relief as to this Court seems just and proper.

Dated: May 28, 2010
White Plains, New York

Respectfully Submitted,

/s/
____________________________
ANDREW C. QUINN, ESQ.

**CERTIFICATION OF SERVICE**

ANDREW C. QUINN, ESQ., an attorney duly admitted to practice law before the Courts of the United States, Southern District of New York, affirms the following under penalty of perjury:

That I am the attorney for Defendant JOSE QUINOY in the above-entitled action; that I am not a party to this action; and that on the 28th day of May, 2010, I served the annexed MOTION TO DISMISS PURSUANT TO RULE 12(B)(2), by ECF, to the following:

U.S. ATTORNEYS' OFFICE, SNY
Attn.: Cynthia Dunne, AUSA
300 Quarropas Street
White Plains, New York 10601

Dated: May 28, 2010
White Plains, New York

/s/

____________________________

Andrew C. Quinn, Esq.