UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------- x

UNITED STATES OF AMERICA

v.

JOSE QUINOY,

Defendant.

---------------------------------------------------------- x

S1 09 Cr. 424 (KMK)

**THE GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE INDICTMENT**

PREET BHARARA
United States Attorney for the
Southern District of New York
Attorney for the United States of America

CYNTHIA K. DUNNE
DAVID J. KENNEDY
Assistant United States Attorneys

– Of Counsel –

# TABLE OF CONTENTS


**Preliminary Statement.. . . . . . 1**

**Summary of the Argument. . . . . . 1**

**Statement of Facts. . . . . . 3**

**A. Detective Michael Hayes .. . . . . 3**

**B. Recordings 1D1, 1D2 and 1D3 . . . . . 4**

**C. The 1D4 Recording. . . . . . 5**

**D. The 1D4 Data. . . . . . 7**

**E. Pena's Statements About 1D4.. . . . . 9**

**F. The 1D5 Recording. . . . . . 11**

**1. The Discovery of 1D5 Session One by USAO. . . . . . 12**

**2. The Transcript of 1D5, Session One . . . . . . 13**

**G. Hayes Was Not Involved in Any Wrongdoing Or Subjected to Improper Influence . . . . . 16**

**I. All Recordings Have Been Produced to Defendant. . . . . . 16**

**POINT ONE**

**THE INDICTMENT SHOULD NOT BE DISMISSED.. . . . . 17**

**A. The Legal Standard. . . . . . 17**

**B. Defendant's Allegations Do Not Justify the Extraordinary Remedy of Dismissal of the Indictment.. . . . . 23**

**1. Defendant Has Failed to Show There Was Destruction of Any Exculpatory Evidence on 1D4.. . . . . 25**

**a. Sessions One and Two of 1D4. . . . . . 25**

**b. Session Three of 1D4 . . . . . 28**

2. The Allegedly Exculpatory Material Can Be Obtained by Other Means .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

POINT TWO

THE GOVERNMENT SHOULD NOT BE SANCTIONED.. . . . . . . . . . . . . . . . . . . 32

A. The Legal Standard. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

B. The Tape-Recorded Conversations of Quinoy Should Not Be Suppressed. . 35

C. There Is No Basis for An Adverse Jury Instruction Against the Government. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

POINT THREE

DEFENDANT SHOULD BE PRECLUDED FROM RAISING AT TRIAL HIS ALLEGATIONS OF GOVERNMENT MISCONDUCT . . . . . . . . . . . . . . . . . . 35

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

## TABLE OF AUTHORITIES

*Arizona v. Youngblood*, 488 U.S. 51 (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 31

*Buie v. Sullivan*, 923 F.2d 10 (2d Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 33

*California v. Trombetta*, 467 U.S. 479 (1984).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 31, 33

*Greene v. United States*, 454 F.2d 783 (9th Cir. 1971). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Hampton v. United States*, 425 U.S. 484 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Higgins v. Martin Marietta Corp*., 752 F.2d 492 (10th Cir. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Jeremiah v. Artuz*, 181 F. Supp. 2d 194 (E.D.N.Y. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Olszewski v. Spencer*, 369 F. Supp. 2d 113 (D. Mass. 2005).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Rochin v. California*, 342 U.S. 165 (1952). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Sparf and Hanson v. United States*, 156 U.S. 51 (1895). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*In re Terrorist Bombings of U.S. Embassies in East Africa*, 552 F.3d 93 (2d Cir. 2008) . . . . . . 33

*Tome v. United States*, 513 U.S. 150 (1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*United States v. Armstrong*, 517 U.S. 456 (1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*United States v. Bogart*, 783 F.2d 1428. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*United States v. Boyd*, 55 F. 3d 239 (7th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*United States v. Broward*, 594 F.2d 345 (2d Cir. 1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*United States v. Kelly*, 707 F 2d 1460 (Cir.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*United States v. Lacey*, 86 F.3d 956 (10th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*United States v. Mendoza-Morales*, 2008 WL 2311409 (D. Or. 2008). . . . . . . . . . . . . . . . . . . . . . 31

*United States v. Santana*, 6 F.3d 1 (1st Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*United States v. Tucker*, 28 F.3d 1420, 1428 (6th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*United States v. Twigg*, 588 F.2d 573 (3d Cir. 1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*United States v. Walls*, 70 F.3d 1323 (D.C. Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*United States v. Zapata*, 356 F. Supp. 2d 323 (S.D.N.Y. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*United States v. Bakhtiar*, 994 F.2d 970 (2d Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*United States v. Batres-Santolino*, 521 F. Supp. 744 (D.C. Cal. 1981). . . . . . . . . . . . . . . . . . . . . 21

*United States v. Bertoli*, 854 F. Supp. 975 (D.N.J. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*United States v. Bielli*, 08 Cr. 381 (ADS), 2010 WL 1133862 (E.D.N.Y. Mar. 26, 2010) . . . . . 20

*United States v. Bin Laden*, 98 Cr. 1023 (LBS), 2001 WL 30061 (S.D.N.Y. Jan. 2, 2001). . 18-20

*United States v. Chin*, 934 F.2d 393 (2d Cir. 1991).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*United States v. Collins*, 755 F. Supp. 110 (S.D.N.Y. 1991).. . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*United States v. Cuervelo*, 949 F.2d 559 (2d Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 20

*United States v. Duggan*, 743 F.2d 59 (2d Cir. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*United States v. Fields*, 592 F.2d 638 (2d Cir. 1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*United States v. Flores*, 63 F.3d 1342 (5th Cir. 1995).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*United States v. Gardner*, 658 F. Supp. 1573 (W.D. Pa. 1987).. . . . . . . . . . . . . . . . . . . . . . . . . . 21

*United States v. Grammatikos*, 633 F.2d 1013 (2d Cir. 1980).. . . . . . . . . . . . . . . . . . . . . . . . 23, 24

*United States v. Jacobs*, 531 F.2d 87 (2d Cir. 1976), *vacated and remanded*,
429 U.S. 909, *aff'd on remand*, 547 F.2d 772 (2d Cir. 1976) .. . . . . . . . . . . . . . . . . . . . . . 20

*United States v. Jones*, 52 F.3d 924 (11th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*United States v. LaPorta*, 46 F.3d 152 (2d Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18, 20

*United States v. Lard*, 734 F.2d 1290 (8th Cir. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

*United States v. Marshank*, 777 F. Supp. 1507 (N.D. Cal. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . 21

*United States v. Myers*, 692 F.2d 823 (2d Cir. 1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19

*United States v. Nichols*, 912 F.2d 598 (2d Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 36

*United States v. Nunez-Rios*, 622 F.2d 1093 (2d Cir. 1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*United States v. Orena*, 145 F.3d 551 (2d Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*United States v. Persico*, CR-92-0351 (CPS), 1997 WL 867788
(E.D.N.Y. Mar. 13, 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 21

*United States v. Rahman*, 189 F.3d 88 (2d Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . 18,19, 33

*United States v. Rastelli*, 870 F.2d 822 (2d Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*United States v. Regan*, 103 F.3d 1072 (2d Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 37

*United States v. Romano*, 706 F.2d 370 (2d Cir. 1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

*United States v. Rosado*, 728 F.2d 89 (2d Cir. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*United States v. Russell*, 411 U.S. 423 (1973). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*United States v. Sattar*, 02 Cr. 395 (JGK), 2003 WL 22510435 (S.D.N.Y. Nov. 5, 2003). . . . . 22

*United States v. Taleb-Jedi*, 566 F. Supp. 2d 157 (E.D.N.Y. 2008). . . . . . . . . . . . . . . . . . . . . . . 36

*United States v. Thomas*, 116 F.3d 606 (2d Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*United States v. Twigg*, 588 F.2d 373 (3d Cir. 1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*United States v. Tyree*, 279 Fed. Appx. 31, 2008 WL 2164147 (2d Cir. 2008). . . . . . . . . . . . . . 23

*United States v. Washington*, 705 F.2d 489 (D.C. Cir. 1983). . . . . . . . . . . . . . . . . . . . . . . . 36, 38

*United States v. Wise*, 221 F.3d 140 (5th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*United States v. Zambrano*, 776 F.2d 1091 (2d Cir. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA :

- v. - : S1 09 Cr. 424 (KMK)

JOSE QUINOY, :

Defendant. :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**THE GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE INDICTMENT**

## Preliminary Statement

The Government respectfully submits this memorandum of law in opposition to defendant Jose Quinoy's motion to dismiss the Indictment on the basis of alleged destruction of exculpatory evidence and alleged denial of due process. For the reasons set forth below, the indictment should not be dismissed, sanctions should not be imposed, and arguments regarding government misconduct should not be presented before the jury.

## Summary of the Argument

The defendant's motion to dismiss the indictment arises from the FBI's handling of one recording, 1D4, and the delay in the FBI's production of another recording, 1D5, to the United States Attorney's Office ("USAO"). The defendant contends that Special Agent Catherine Pena of the FBI ("SA Pena") conspired to destroy exculpatory evidence with cooperating witness Detective Michael Hayes ("Hayes"), a police officer who spoke truthfully about the defendant's violent, abusive, and illegal behavior, and who agreed to cooperate with the FBI, knowing the potential professional fallout that likely would occur when his cooperation became public.

A four-day hearing was held to explore the circumstances surrounding the missing data from recording 1D4 and the production of 1D5. An FBI technician testified at the hearing that the recording device used to record 1D4 contained data when it was given to her to download by SA Pena on June 6, 2008. The technician's practice is to download the data to an original disk, then to duplicate the data from the original disk for the FBI agent's use, to confirm the transfer of data, and then to place the original disc into an Electronic Surveillance ("ELSUR") envelope which is placed in a vault. The original 1D4 disk retrieved from ELSUR in this matter, however, is a blank and unformatted disk, inconsistent with the technician's records and practice. The technician testified that she always confirms a successful download before deleting data from the FBIRD, and that she could not have made copies or have downloaded data onto an unformatted disk because the FBIRD program would have stopped the process with an error message. Similarly, she could not have provided SA Pena with copies of an unformatted disk.

SA Pena has given inconsistent explanations about her own handling of 1D4. Initially, she said a technician told her there was no data and provided her with copies of the blank 1D4 disk, which she threw out. She later changed her account of those events. In addition, SA Pena's testimony about her handling of recording 1D5 (in which 1D4 was discussed and which was fully and timely produced to the defense), appears to conflict with the documents found on SA Pena's computer and in her files.

The defendant contends that Hayes and SA Pena conspired to destroy exculpatory evidence. The evidence at the hearing, however, does not support the conspiracy theory, or the inference that Hayes was involved in any wrongdoing. There is simply no evidence that Hayes did anything improper in connection with 1D4, or any other evidence.

Primarily due to the loss of data on recording 1D4, the defendant seeks the drastic remedy of dismissal of the Indictment due to outrageous government conduct, relief that no court in this Circuit has granted for at least thirty years. For the defendant, the legal standards governing the outrageous government conduct doctrine create an insuperable obstacle. Regardless of whether SA Pena did in fact swap a blank disk for the 1D4 disk that contained data, as alleged by the defendant, there is no indication that 1D4 contained evidence that was exculpatory, admissible or that could not be substantially recreated through witness interviews. Furthermore, the government's conduct, even viewed in the light most favorable to the defense, is not outrageous misconduct of a constitutional magnitude and played no part in the defendant's acts which formed the basis of the underlying criminal charges, and therefore does not justify giving the defendant a free ride for assaulting restrained prisoners in 2006, long before the handling of 1D4.

Because the defendant cannot establish the loss of exculpatory evidence that cannot be replaced, his motion to dismiss the indictment should be denied, sanctions should not be imposed against the government, and arguments and proof relating to the conspiracy theories advanced in the defendant's motion should be precluded from being raised before the jury.

## Statement of Facts

The following facts are drawn from the transcript of the four-day hearing conducted by the Court and the exhibits received in the course of the hearing.

### A. Detective Michael Hayes

Detective Michael Hayes has been with the Sleepy Hollow Police Department ("SHPD") since 2006, when he started as a patrol officer, and has been a Detective since November of 2009. (Tr. 211). In or around January of 2008, Hayes learned of a federal investigation into the

events of October 17, 2006, when he witnessed fellow Police Officer Jose Quinoy attack a handcuffed and restrained Mario Gomez (the "Gomez incident"). (Tr. 12). Hayes had reported his observations both to his father (then a SHPD Lieutenant) and also to SA Todd Spota, who lived in Sleepy Hollow. (Tr. 72-74, 118, 184, 195).

In or about April of 2008, Hayes was approached by SA Pena, who asked him to assist in a federal investigation of the Gomez incident by wearing a recording device in conversations with Quinoy and others. (Tr. 13-14). Recognizing the potential detrimental impact that cooperation could have on his career, Hayes nonetheless agreed to make recordings for the FBI because he thought that what Quinoy did on October 17, 2006 was wrong and would otherwise go unaddressed. (Tr. 195). In the course of his cooperation with the FBI, Hayes recorded three conversations with Quinoy. (Tr. 13, 16, 34). Other than those three conversations, Hayes never discussed the Gomez incident with Quinoy. (Tr. 14, 16, 34, 54). Pursuant to SA Pena's instructions, Hayes later recorded conversations with others. (Tr. 267-68).

**B. Recordings 1D1, 1D2 and 1D3**

The three conversations Hayes had with Quinoy were made on or about April 3, April 4, and April 16, 2008 (recordings known as 1D1, 1D2 and 1D3). (Tr. 13, 16, 34). Among other statements in these recordings, Quinoy directs Hayes to deny that he saw any assault upon a handcuffed Gomez (GX 1000 at 10); tells Hayes that: "Nobody, nobody knows what you saw, what you felt, what you heard, you know, except for you. You know?" (GX 1000 at 5; GX 1001 at 5); directs him to respond to questions asking what he saw by falsely stating, "I wasn't lookin' that way, I was lookin' this way." (GX 1000 at 10); upon hearing that Hayes would testify that he saw Quinoy kick Gomez in the head while Gomez was handcuffed and restrained in the back of a

police car, Quinoy asks “Have you told anybody that story?” (GX 1001 at 16), and warns Hayes that: “You can’t fucking say that.” (GX 1001 at 7); upon hearing that Hayes would testify that he saw Quinoy punch Gomez while Gomez was cuffed and restrained, Quinoy says: “That’s gonna put, that’s gonna put me behind bars.” (GX 1001 at 20); provides Hayes with a lengthy account of what to say instead of the truth (GX 1001 16-21, 37-38); and finally, advises Hayes that his grand jury testimony was “key” and “if you get past the grand Jury, the grand jury doesn’t indict, that’s it; then it is over.” (Tr. 30-31; GX 1001 at 45).

Once Hayes completed each recording with Quinoy, he returned the FBIRD to SA Pena, who in turn brought the FBIRD to FBI technicians so that the recordings could be downloaded. The supervisory technician responsible for those downloads, Diane Payne, testified that there was no possible way for Hayes to either alter or listen to the contents of the FBIRD before the technicians accessed the data on their computers. (Tr. 227-28). Payne and her co-worker, Daphne Warrington-Gaskins (“Gaskins”) identified their respective handwriting on the original 1D1, 1D2 and 1D3 disks and attested to the forms they filled out contemporaneous with downloading the information from the FBIRDs. Gaskins and Payne further testified that the lengths of the sessions on the original disks corresponded to the information that they contemporaneously recorded on the worksheets they created when they originally accessed the data from the FBIRDs. (Tr. 312-21, 328-30, 231-34). The entire contents of recordings 1D1, 1D2, and 1D3 – the only recordings involving Quinoy – were therefore downloaded and subsequently produced to the defendant. (Tr. 449, 727; GX 1040, 1041, 1042, 1043 ).

**C. The 1D4 Recording**

On or about May 22, 2008, along with FBI Special Agent Michael Sabric (“SA Sabric”),

SA Pena met with Hayes, provided him with an FBIRD recording device, and asked him to record a conversation with SHPD Officer Richard D'Alessandro, who was present for portions of the Gomez incident. (Tr. 676-77; GX 1031). In their brief meeting, Hayes told SA Pena and SA Sabric that he had been approached by Spota, who had confronted Hayes and asked him if he had told the FBI that Spota was Sleepy Hollow's Fire Chief. (Tr. 36). Spota had specifically instructed Hayes not to mention the conversation to SA Pena, an instruction that Hayes disregarded in relaying the conversation to SA Pena and SA Sabric. (Tr. 36).

Hayes left the meeting with SA Pena and SA Sabric, placed the recording device in his pocket, and went back to patrol duty. He thereafter unwittingly recorded himself for a period of time, including during a roadside assistance call and in a brief telephone call that he placed to his father, Gabriel Hayes. (Tr. 37-39). In that conversation, Hayes told his father that: he had just met with SA Pena; he had told SA Pena about the contact from Spota; and that he had "fucked Todd Spota," by telling SA Pena of the contact he had been instructed by Spota not to disclose. (Tr. 37-38).[1]

About 45 minutes after leaving SA Pena, Hayes realized that the recording device was still activated and attempted unsuccessfully to deactivate the recorder. (Tr. 37-39). Accordingly, Hayes called SA Pena, told her about the inadvertent recording, and she talked him through the process of shutting off the recorder. (Tr. 37-39). Although both SA Pena and Hayes knew that the FBIRD had recorded Hayes in his discussion with his father, Hayes retained the FBIRD to

---

[1] Gabriel Hayes, a retired SHPD Lieutenent, corroborated Hayes' account by testifying that while at a Yankee game he had received a call from his son, in which his son mentioned something about Spota. (Tr. 440, 443).

attempt to engage D'Alessandro in a discussion regarding the Gomez incident. Neither SA Pena nor Hayes sought to substitute the FBIRD to eliminate the conversation that Hayes told SA Pena he had recorded with his father.

Two days later, on May 24, 2008, Hayes reactivated the FBIRD and recorded a brief conversation with D'Alessandro in the locker room of the SHPD. (GX 1003; Tr. 39-42). In that conversation, D'Alessandro claimed that he had not seen Quinoy punch or kick Gomez while Gomez was restrained, and said that he had placed Quinoy into the back of the police car head first. (Tr. 44). The same day, Hayes notified SA Pena that he had recorded a conversation with D'Alessandro and made arrangements to return the 1D4 recording device to SA Pena. Other than a brief mention when he picked up the 1D5 recording device a few days later, SA Pena never again mentioned the 1D4 recording to Hayes, did not task Hayes to engage D'Alessandro in another recording, and, consistent with other instances where she had the actual recordings, did not debrief Hayes in detail about the conversation. (Tr. 44-45).

**D. The 1D4 Data**

Consistent with the handling of the previous recordings in which Hayes had spoken to defendant Quinoy (1D1, 1D2, and 1D3), SA Pena gave the FBIRD with recording 1D4 to the FBI technicians. Gaskins downloaded the 1D4 recording, and filled out contemporaneous documentation indicating that there were three recordings on the FBIRD: two recordings lasting 118 minutes and 24 minutes on May 22, 2008 (the day the FBIRD was handed to Hayes by SA Pena with SA Sabric present); and one recording lasting 20 minutes on May 24, 2008 (the day Hayes spoke with D'Alessandro). (Tr. 322-23; GX 1015).

According to the ELSUR envelope, the download of information from the FBIRD was

completed on June 6, 2008 and SA Pena picked up the disk later the same day. (Tr. 327; GX 1017). Gaskins did not recall SA Pena ever mentioning that she had a problem accessing data on the disk. (Tr. 328). Based upon the paperwork that she prepared in 2008, Gaskins testified that she would not have told SA Pena that the disc was blank because according to her paperwork, the FBIRD contained data and she placed an original disk containing data in an ELSUR envelope, which she would only do after spot checking the disk, making copies and confirming that data was successfully transferred. (Tr. 344-46, 382-83). With regard to the original disk now contained in the ELSUR envelope, Gaskins said that the handwriting on the original disk appeared to be hers (Tr. 321-22; GX 1015, 1016, 1016-A), but she could not say with complete certainty that the handwriting was not written by someone else and could not explain why the disk was blank, since her contemporaneous records from 2008 indicate that the disk had data that was retrieved. (Tr. 356-61; GX 1015). Both Gaskins and Payne testified that there are procedures utilized when there are problems with the download process and that none of those procedures were utilized with this FBIRD, which was put back into use. (Tr. 341-42, 371).

The evidence at the hearing indicated that the only individuals who could have been recorded on 1D4 were Hayes, SA Pena, SA Sabric and D'Alessandro. The only evidence of any potentially relevant material on this recording is Hayes's testimony about his May 24, 2008 conversation with D'Alessandro in which D'Alessandro said he had not seen Quinoy kick or punch Gomez while Gomez was restrained (Tr. 297), plus two emails from SA Pena to AUSA Kennedy on May 24, 2008, in which she reported that Hayes had recorded a "good" conversation with D'Alessandro, who said that he had placed Gomez into the police car head first. (Tr. 541; DX- L, at G-4). There is no indication that any conversation captured between SA Pena and SA

Sabric, or between SA Pena and Hayes, or anything that happened while Hayes was responding to radio calls in the ordinary course of his police duties, bore any relationship to anything at issue in this case.

**E. SA Pena's Statements About 1D4**

SA Pena testified that she collected the 1D4 recording unit from Hayes on June 4, 2008 and delivered the unit to FBI technicians two days later, on June 6, 2008. (Tr. 531). SA Pena's various statements about what happened next are inconsistent.

Prior to May 8, 2010, SA Pena told AUSAs, FBI counsel and her FBI supervisor that when she reported to the technical unit on June 6, 2008 to collect 1D4, she was given an original and two copies of the recording, which a technician told her was blank.[2] SA Pena explained that she believed that she threw out her duplicate copies of the 1D4 disks because they were blank. (Stip. ¶ 2 and 8.) In contrast to the testimony of her supervisor and stipulations provided to the defense regarding AUSA testimony, SA Pena testified that she never told anyone that she had picked up copies of the 1D4 disks, but rather, said that she had told others that she "might have" picked up copies but that she was not sure. (Tr. 535, 536, 552, 558, 596-97).[3] At the hearing, SA

---

[2] SA Pena's supervisor Michael D'Alonzo testified that he asked SA Pena about 1D4, and she initially told him in substance that she had retrieved copies of blank 1D4 disks from FBI technicians and that she disposed of the disks because the original was maintained in the evidence envelope. (Tr. 701-05). SA Pena later changed her account and instead told D'Alonzo that she did not know whether or not she had copies of the disks. (Tr. 708-10).

[3] SA Pena later provided a different account of her handling of 1D4, after a May 10, 2010 meeting at the USAO between FBI supervisors and AUSAs. SA Pena testified that she was told by AUSAs before May 8, 2010 that the FBI's data technician had contemporaneously recorded that there were three sessions recorded by the 1D4 FBIRD unit. (Tr. 533, 611, 612). The USAO, however, first learned on May 8, 2010 that there were three sessions, and thus could not have shared that information with SA Pena before May 8, 2010. (Stip. at 16).

Pena initially testified that the FBI clerk told her, in substance, that: "I don't have anything for you. It's blank. There's nothing on here. It didn't work." (Tr. 531-32, 537, 539, 545, 547-48). SA Pena later testified that her recollection of this conversation might be erroneous. (Tr. 595).

SA Pena further testified that although she was not required to place a blank disk into evidence, she nonetheless placed a blank 1D4 disk into an ELSUR envelope, because she wanted to maintain a record of the information that was annotated on the outside of the envelope. (Tr. 553-54, 559).[4] SA Pena testified that she was required to file an FBI 302 about the May 2008 failed recording in a timely fashion. (Tr. 531-32). SA Pena did not, however, prepare a Form 320 documenting the blank disk until November 7, 2008. (DX-GG).

In mid-October of 2008, AUSAs pressed SA Pena to provide the copies of recordings made by the cooperating witness to the USAO. (Tr. 654-55). SA Pena testified that she removed the original 1D4 from ELSUR on October 28, 2008, to see if she could retrieve any data from the disk, and returned it on November 7, 2008, on which date she prepared a Form 302 documenting that the 1D4 recording was blank.[5] (Tr. 532, 537; DX-FF). SA Pena testified that she confirmed that the disk was blank, but she does not recall asking anyone for technical assistance with regard to the disk. (Tr. 585-86). SA Pena initially testified she reported the blank 1D4 recording to AUSAs within a week of discovering that it was blank. (Tr. 544). Records of the USAO,

---

[4] The defendant claims that on June 6, 2008, SA Pena created two separate reports pertaining to this case, but did not mention the blank 1D4 disk in either report. (Tr. 549; DX-HH and DX-II). SA Pena's computer records, however, indicate that her reports were created earlier in the day than the time she picked up 1D4. (*Id.*)

[5] The defendant erroneously states that SA Pena never removed any of the other recordings from ELSUR. (Br. at 11). SA Pena removed recording 1D7 from ELSUR at the same time as she removed 1D4, on October 23, 2008, at 3:36 p.m., and then returned 1D7 to storage on November 7, 2008, at 12:50 p.m. (GX 1026).

however, indicate that SA Pena first directly notified AUSAs that the 1D4 recording was blank through a June 2009 email, although SA Pena's November 7, 2008 Form 302, was produced to the USAO in early 2009, among a large number of other 302s.

**F. The 1D5 Recording**

On June 4, 2008, SA Pena asked Hayes to record a conversation with SHPD Officer Michael Gasko, another witness to the Gomez incident. (Tr. 45). When Hayes and SA Pena met, the recorder was once again unintentionally activated, and recorded their thirty minute conversation. In that conversation, Hayes told SA Pena that he had said something "inappropriate" in the previous recording (1D4) when speaking to his father on the phone for about a minute and a half, referring to his statement that he had "fucked Todd Spota." (Tr. 46-48). In the 1D5 conversation inadvertently recorded, neither SA Pena nor Hayes sound particularly concerned about the overcollection of data on 1D4. (DX-A).

Although Hayes initially testified that he first knew about the inadvertent 1D5 recording in May of 2010, in preparation for the hearing (Tr. 46), on cross examination, when the final few seconds of the recording was played for him a few times, he recalled that he had known on the date of the recording, June 4, 2008, that the recorder was activated. However, Hayes never knew before May of 2010 that the FBIRD had actually recorded anything, and never listened to the recording before May of 2010. (Tr. 46, 88-89, 95). Hayes did not consider his June 4, 2008 conversation with SA Pena significant and never mentioned it to SA Pena, and as with 1D4, neither Hayes nor SA Pena took any action to replace the recorder with a new unit. (Tr. 91, 93). Instead, Hayes maintained the 1D5 FBIRD and recorded a conversation with Gasko. (DX-A.)

Consistent with the handling of recordings 1D1, 1D2, 1D3, and 1D4, SA Pena gave the

FBIRD with recording 1D5 to the FBI technicians. Gaskins downloaded the recordings on the FBIRD, and both Sessions – the inadvertent conversation between Hayes and SA Pena and the intentional (although irrelevant) conversation between Hayes and Gasko – were produced to the defendant in their complete and original format on May 4, 2010. (Tr. 730).

**1. The Discovery of 1D5 Session One by USAO**

USAO Paralegal Shannon Becker testified that on or about April 15, 2010, after several ignored requests to SA Pena for copies of recordings, SA Pena brought the original disks of recordings 1D1 through 1D7 to the USAO and placed them in their sealed envelopes into the USAO vault. (Tr. 448-49). SA Pena told Becker that she could not sign over custody of the tapes to Becker, because FBI policy prohibited SA Pena from relinquishing custody of the tapes. (Tr. 450, 453).

On the evening of May 3, 2010, SA Pena was instructed to prepare an index of all recordings made by Hayes and to make sure they were all on the USAO's shared directory. SA Pena testified that she first learned of the overcollection of data on 1D5, Session One that evening. (Tr. 621-22; 638-39). Pena testified that she discovered the recording of Session One and exclaimed "oh crap" and then reported the recording to AUSA Dunne and stated to Dunne, "You are going to be mad at me." (Tr. 639, 667). In contrast, Becker testified that she, not SA Pena, discovered the recording, she placed it into the computer, scanned its contents, recognized Hayes' voice and when she questioned SA Pena, SA Pena said, in substance, that the recording was a non-pertinent discussion inadvertently recorded one day when SA Pena needed directions to a location. (Tr. 476-77, 494, 722-23, 731). In her testimony, SA Pena denied downplaying the significance of Session One. (Tr. 640-42).

SA Pena conceded that she had ignored AUSA requests for a summary of the recordings made by the cooperating witness (Tr. 667-68.) As a result of these delays by SA Pena, the USAO was nearly delayed in producing to defendant a copy of 1D5, both Sessions, which it did on May 4, 2010. (Tr. 730).

**2. The Transcript of 1D5, Session One**

The transcript of 1D5, including both Session One and Session Two, went through various drafts that culminated in a "final" transcript that only included Session Two. On June 24, 2008, SA Pena sent a copy of the 1D5 disk to the FBI's data processing unit for transcription. (DX-LL; Tr. 625-26). FBI typist Delores Paliseno prepared a complete transcript of 1D5, which including SA Pena's thirty minute conversation with Hayes, and emailed it to SA Pena on July 9, 2008. (Tr. 626; DX-F). SA Pena testified that although she probably downloaded or printed the transcript, she did not look at it. (Tr. 628). The next available version of this transcript is a draft transcript which is missing all but the first page of Session One (SA Pena's preamble and the conversation between Hayes and SA Pena) and contains Hayes' handwritten revisions only on the pages pertaining to Session Two of 1D5, the conversation with Michael Gasko. DX-B, also marked as GX 1035, is this version of the transcript of 1D5 which SA Pena sent to the FBI word processing pool for retyping. (Tr. 634).

Following the evidentiary hearing, the Government determined that there was an earlier version of the transcript marked-up by Hayes which was contained on a disk labeled by SA Pena as "scan copy no good" which was found in SA Pena's 1D5 working white envelope . (DX-EE). A color copy of GX 1035, marked GX 1035 (color), was immediately produced to the defense,

along with a copy of the earlier version of the same transcript, now marked as DX-EE-T.[6] Comparison of GX 1035 (color) to the contents of DX-EE-T, indicates that both documents are shortened draft transcripts containing Hayes' revisions. DX-EE-T is an earlier version of the draft transcript which contains all of Hayes' edits, but does not contain all of the edits that are on GX 1035, the version that was sent to word processing to be retyped. Copies of both documents are annexed to this brief as GX 1035(color) and DX-EE-T.

A thorough comparison of the two documents (GX 1035 and DX-EE-T) indicates that someone went through the transcript after Hayes completed his revisions and crossed out the "UM" annotations that Hayes failed to strike out, in light pink ink. Hayes testified that none of the annotations on page one of GX 1035 are his. (Tr. 100). Hayes identified his edits, which on the color version appear in red ink and are contained on DX-EE-T, the earlier version of the document. The color version of GX 1035 (also marked as DX-B), reflects that annotations on the front page appear in red, pink and blue ink. (GX 1035(color)). There are additional pink strikeouts on GX 1035, the version of the transcript that was sent out for re-typing, that appear to have been added after the creation of DX-EE-T. Specifically, some of the "UM" strike outs found on pages 33, 34, 36, 39 and 40 of GX 1035(color) are made in light pink ink and do not appear in the earlier version of the transcript found on DX-EE-T.

SA Pena submitted the version containing additional edits, GX 1035 (which omitted twenty-seven pages of transcript originally sent to her by Paliseno), to the FBI typing pool, which in the interim had been moved to Goshen. A later version was created and retyped by FBI typist

---

[6] SA Pena testified that she placed a post-it on DX-EE saying "scan copy no good" because it contained a scanned document that she was unable to open. (Tr. 690). The USAO did not encounter any difficulty opening the file stored on that disk. (Tr. 502, 503).

Julie A. Knapp, in Goshen. (Tr. 641; GX 1036). The only reference to Session One on the later version is found on page two, where SA Pena's preamble and a few seconds of dialogue between Hayes and SA Pena appear. (GX 1036).

SA Pena testified she received the re-typed version of the 1D5 transcript from Knapp on or about August 7, 2009. (Tr. 641,643). On September 1, 2009, Pena had Hayes sign a transcript of 1D5, which incorporated his edits to Session Two, but which also contained the page with SA Pena's preamble and unedited dialogue with Hayes. (Tr. 644). A few weeks later, on September 28, 2009, SA Pena asked Hayes to sign a revised front page of a 1D5 transcript, which is marked "final" in SA Pena's handwriting (Tr. 645), and in which any reference to Session One of 1D5 had been deleted. (Tr. 645-46; GX 1005). SA Pena testified that she had no idea how the transcript of Session One of 1D5 came to be separated from the transcript of Session Two or how the reference to Session One came to be deleted. (Tr. 630, 715-19).

Throughout the entire process, Hayes had no role or input over what transcripts or recordings he made, reviewed or edited. Hayes testified that he would enter a conference room, unstapled transcript pages were placed in front of him, and SA Pena would cue up a recording for him to listen to on a laptop computer. Hayes testified that he wore headphones and listened to the recordings, and could rewind within the particular track or session that SA Pena had cued up for him. (Tr. 48-49, 198). Hayes never reviewed or listened to Session One and SA Pena only asked him to review Session Two of 1D5, which he did. (Tr. 49-50).

In the earliest versions of the 1D5 transcript, Hayes' handwriting appears only on the portion of the transcript that pertains to Session Two. (Tr. 101; GX 1035(color), DX-B, DX-EE-T). Hayes testified that he was certain that he had not listened to 1D5, Session One, as part of his

review of transcripts. Among other things, Hayes would have inserted former SHPD Officer Barry Campbell's name into the one-page transcript, as the name was clearly audible to him, and the transcript indicates that Campbell's name was inaudible. (Tr. 51-52; GX 1004). SA Pena never mentioned the inadvertent recording of Session One to Hayes and never presented him with a transcript of that conversation. (Tr. 104-105).

**G. Hayes Was Not Involved in Any Wrongdoing Or Subjected to Improper Influence**

Hayes testified that SA Pena never told him what witnesses had said about the Gomez incident, never suggested that Hayes alter his account of the event, and never suggested or instructed him to attempt to persuade others to alter their accounts (Tr. 54-56). SA Pena never discussed either the Luis Vilches or the Jose Rivera incidents with Hayes. (Tr. 56). Indeed, the Rivera incident occurred before Hayes became a member of the SHPD, and Hayes was not a witness to the Vilches incident.

On each and every occasion he was given an FBIRD – even when he knew there had been an overcollection of data – Hayes returned the FBIRD units to SA Pena so that the data could be accessed by the FBI. Hayes' only role in the preparation of the transcripts of the recordings was to review recordings and corresponding transcripts placed before him by SA Pena.[7] (Tr. 48-49).

**I. All Recordings Have Been Produced to Defendant**

Starting on July 23, 2009, ethical wall AUSA John Collins provided defense counsel with

---

[7] Hayes' cooperation with the FBI has had a negative impact on his working relations at SHPD. After defense counsel disclosed Hayes' identity as a cooperator in open court, SHPD supervisors, colleagues, and the PBA union, egged on by Quinoy's misleading allegations that Hayes made the recordings without FBI authorization, retaliated against Hayes and attempted to expel him from the PBA because he witnessed wrongdoing and reported it. (*See* Gvt. 404(b) Motion).

all three recordings that included Quinoy – 1D1, 1D2, and 1D3. (Tr. 449, 727; GX 1040, 1041, 1042, 1043). By letter dated September 17, 2009, AUSA Collins advised defense counsel that he would provide copies of the recordings to the trial team, absent an objection. (*See id.* at 1-7). Defense counsel raised no objection. The recordings that are actually related to evidence in the case, therefore (1D1, 1D2, and 1D3), have been in the hands of the defense team for almost one year. The remainder of the recordings, regardless of relevance and including seconds-long recordings of SA Pena saying "testing, testing," were produced to the defendant timely on May 4, 2010, when the Government was scheduled to produce *Giglio* and recorded 3500 material of its potential trial witnesses. (Tr. 730-31).

**POINT ONE**

**THE INDICTMENT SHOULD NOT BE DISMISSED**

**A. The Legal Standard**

The Second Circuit has recognized that "there are circumstances where government conduct in its investigation of a crime may be so outrageous as to require reversal of the conviction." *United States v. Zambrano*, 776 F.2d 1091, 1098 (2d Cir. 1985). "To violate due process, however, the government's conduct must reach . . . a demonstrable level of outrageousness before it could bar conviction." *United States v. LaPorta*, 46 F.3d 152, 160 (2d Cir. 1994) (internal quotation marks and citations omitted). "Such a claim rarely succeeds." *Id.*; *see also United States v. Romano*, 706 F.2d 370, 372 (2d Cir. 1983) (Government's conduct must be "so repugnant and excessive as to shock the conscience" for a claim of outrageous government conduct to violate due process).

The standard for dismissal of an indictment is stringent. "The paradigm examples of

conscience-shocking conduct are egregious invasions of individual rights" – examples that plainly do not apply here. *See, e.g., Rochin v. California*, 342 U.S. 165, 172 (1952) (breaking into suspect's bedroom, forcibly attempting to pull capsules from his throat, and pumping his stomach without consent constitutes outrageous government conduct); *United States v. Rahman*, 189 F.3d 88, 131 (2d Cir. 1999) (citing *Rochin*).[8] To allege a viable claim of outrageous government conduct, "the defendant must establish that the government engaged in outrageous behavior *in connection with the alleged criminal events* and that due process considerations bar the government from prosecut[ion]." *United States v. Cuervelo*, 949 F.2d 559, 565 (2d Cir. 1991) (emphasis added); *see also Bin Laden*, 2001 WL 30061, at *7 (noting defendant must show "the government actively participated in the criminal enterprise"). Yet even when a defendant sufficiently alleges that the government engaged in outrageous behavior in connection with the alleged criminal event, the Second Circuit has always rejected such a claim. *See, e.g.*, *Rahman*, 189 F.3d at 131 (informant's involvement in bombing plot not outrageous conduct); *LaPorta*, 46 F.3d at 160-62 (alleged enticement to commit arson not outrageous conduct); *United States v. Chin*, 934 F.2d 393, 398 (2d Cir. 1991) (postal authorities' alleged manipulation of defendant into buying child pornography not outrageous conduct); *United States v. Duggan*, 743 F.2d 59, 84 (2d Cir. 1984) (informant's involvement in IRA gun-running scheme not outrageous conduct); *Romano*, 706 F.2d at 372 (drug transactions initiated by government informants using government-supplied drugs not outrageous conduct); *United States v. Myers*, 692 F.2d 823, 836-

---

[8] Significantly, the Supreme Court's discussion of outrageous governmental conduct is largely *dicta*. Apart from *Rochin,* and in the context of a motion to dismiss an indictment, "[t]he Supreme Court has never ruled on an assertion of outrageous government conduct." *United States v. Bin Laden*, 98 Cr. 1023 (LBS), 2001 WL 30061, at *7 (S.D.N.Y. Jan. 2, 2001).

37 (2d Cir. 1982) (government-initiated sting investigation involving bribery of members of Congress not outrageous conduct). Notably, the defendant does not allege any involvement by any governmental agent in the specific crimes for which he has been charged; there is no allegation that SA Pena had any role in Quinoy's use of excessive force against Mario Gomez on October 17, 2006, his use of excessive force against Luis Vilches on December 17, 2006, or his efforts on April 3, 4, and 16, 2008, to persuade Hayes to lie to the grand jury.

The "outrageous government conduct" doctrine has its origin in *United States v. Russell*, 411 U.S. 423 (1973), where the Supreme Court suggested in *dicta* that government action could be "so outrageous that due process principles would absolutely bar the government from invoking judicial process to obtain a conviction." *Id.* at 431-32. As precedent suggests, the requisite level of outrageousness for a defendant to prevail in such a claim is extremely high. *See Rahman*, 189 F.3d at 131 ("the burden of establishing outrageous investigatory conduct is very heavy"); *Bin Laden*, 2001 WL 30061, at *12 ("the requisite level of outrageousness is extremely high"); *United States v. Persico*, CR-92-0351 (CPS), 1997 WL 867788, at *19 (E.D.N.Y. Mar. 13, 1997) ("Dismissal of a criminal indictment for outrageous government conduct is rare."), *aff'd in relevant part sub nom. United States v. Orena*, 145 F.3d 551 (2d Cir. 1998). The Second Circuit has specifically noted "our well-established reluctance to dismiss criminal prosecutions because of faulty Government investigation." *Myers,* 692 F.2d at 843 (citations omitted). Although the defendant bases his motion on this doctrine, in *none* of the cases relied upon by the defendant did the Court dismiss the indictment based upon the alleged destruction of exculpatory

evidence.[9]

Indeed, since the Supreme Court addressed the doctrine of "outrageous governmental conduct" over thirty years ago in *Hampton v. United States*, 425 U.S. 484 (1976), the Second Circuit has never held that outrageous Government conduct required reversal of a conviction. *LaPorta*, 46 F.3d at 160; *Bin Laden*, 2001 WL 30061, at *7. In one case, *Cuervelo,* the Second Circuit remanded for a hearing on the defendant's claim that a DEA agent had deliberately used his sexual relationship with her as a investigative tool, to develop the record, *see Cuervelo*, 949 F.2d at 568-69. However, the Court did not reach the merits of the claim, and the case was resolved in the district court before any further proceedings were held. Since *Hampton* was decided in 1976, there have apparently been only two federal appellate decisions that have held Government conduct sufficiently outrageous to warrant reversal of a conviction, and in both cases governmental agents participated in the charged crimes. *See United States v. Lard*, 734 F.2d 1290 (8th Cir. 1984) (ATF agents assisted defendant in making pipe bomb); *United States v. Twigg*, 588 F.2d 373 (3d Cir. 1978) (government agents induced a defendant to enter the drug trade). *See LaPorta*, 46 F.3d at 160 (noting scarcity of authority); *Bin Laden*, 2001 WL 30061, at

---

[9] Defendant argues that the Second Circuit has recognized that the extreme sanction of dismissal may be appropriate, citing *United States v. Fields*, 592 F.2d 638 (2d Cir. 1978), and *United States v. Jacobs*, 531 F.2d 87 (2d Cir. 1976), *vacated and remanded*, 429 U.S. 909, *aff'd on remand*, 547 F.2d 772 (2d Cir. 1976). (Br. at 26.) *Fields* actually *reversed* the district court for imposing the "most drastic remedy" of dismissal of a portion of an indictment, in a case where SEC attorneys had referred a matter for criminal prosecution to the USAO while negotiating a civil settlement. The court noted the availability of lesser alternative disciplinary remedies for government misconduct and the need to give proper regard to the public's interest in seeing crimes prosecuted. *Jacobs* did not even address the issues presented in this case. In *Jacobs* the defendant's testimony that formed the basis of a perjury count was obtained improperly and the suppression of that supported the dismissal of that count. Neither case supports the dismissal of an indictment based upon the alleged destruction of evidence of minimal evidentiary value.

*7 (same); *Persico*, 1997 WL 867788, at *20 ("It is generally recognized that *Twigg* stands alone among appellate decisions in the last twenty years to overturn a conviction for outrageous government misconduct.") (citations omitted).

While district courts, on occasion, have found the defense of "outrageous government conduct" justified, the Government is unaware of any authority that supports the dismissal of an indictment where the alleged government conduct did not involve the government's role in facilitating the criminal conduct that formed the charges facing the defendant. *See Lard*, 734 F.2d 1290; *Twigg*, 588 F.2d 573; *Greene v. United States*, 454 F.2d 783 (9th Cir. 1971) (pre-*Hampton* and *Russell*) (agents manufactured a crime for the sole purpose of convicting the defendant); *United States v. Marshank*, 777 F. Supp. 1507 (N.D. Cal. 1991) (government collaborated with defense attorney against his own clients); *United States v. Gardner*, 658 F. Supp. 1573 (W.D. Pa. 1987) (agents induced the defendant, a former United States Marine, to purchase cocaine when he had no criminal record and expressed a reluctance to commit the crime); *United States v. Batres-Santolino*, 521 F. Supp. 744 (D.C. Cal. 1981) (agents induced defendants, who had no criminal record, to enter into the drug trade and supplied defendants with drugs).

Indeed, some circuit courts have rejected the "outrageous government conduct" defense in its entirety or have severely restricted its use, as the judicial supervision of government investigations is seen as infringing upon the separation of powers. *See United States v. Lacey*, 86 F.3d 956 (10th Cir. 1996) (commenting on the narrow scope of the rule, reserved for only the most egregious circumstances); *United States v. Boyd*, 55 F.3d 239 (7th Cir. 1995) (rejecting the outrageous government conduct defense); *United States v. Tucker*, 28 F.3d 1420, 1428 (6th Cir. 1994) (separation of powers mandates rejection of outrageous conduct defense); *United States v.*

*Santana*, 6 F.3d 1, 3-4 (1st Cir. 1993) (defense is the "deathbed child" of the entrapment defense, long since discarded). Other courts have significantly restricted the doctrine. *See United States v Walls*, 70 F.3d 1323, 1330 (D.C. Cir. 1995) (defense reserved for cases involving brutality, coercion or violence to the defendant); *United States v. Bogart*, 783 F.2d 1428 (9th Cir. 1986) (government must have manufactured the crime).

Although the Second Circuit recognizes the defense, in an opinion authored by Judge Feinberg, the Court stated that "especially where serious criminal conduct is involved, it must be reserved for the truly extreme cases." *United States v. Broward*, 594 F.2d 345, 351 (2d Cir. 1979) (reversing dismissal of indictment in case where false sworn testimony was contained in arrest warrant, because of the availability of alternative internal departmental measures to address the conduct of law enforcement that would not thwart the public interest in prosecuting serious crimes). The Government is not aware of any case at any time in any Circuit that has dismissed the indictment for the reason the defendant now urges – because exculpatory evidence was allegedly destroyed.

In challenges resulting from the alleged destruction of evidence, courts have held that the defendant must demonstrate that: (1) the government must have acted in bad faith in destroying the evidence; (2) the evidence must possess an exculpatory value evident before it was destroyed; and (3) the defendant must be 'unable to obtain comparable evidence by other reasonably available means.'" *United States v. Sattar*, 02 Cr. 395 (JGK), 2003 WL 22510435, at *2 (S.D.N.Y. Nov. 5, 2003) (rejecting claim of FBI misconduct in failing to preserve recordings of phone calls) (quoting *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988)); *California v. Trombetta*, 467 U.S. 479, 489 (1984) (lower court erred in dismissing conviction for failure to preserve

breathalyzer tests); *Buie v. Sullivan*, 923 F.2d 10, 11-12 (2d Cir. 1990) (refusing to reverse conviction where government arrested witness with potentially exculpatory material); *United States v. Rastelli*, 870 F.2d 822, 833 (2d Cir. 1989) (refusing to dismiss conviction for loss of allegedly exculpatory tapes and documents); *see also United States v. Tyree*, 279 Fed. Appx. 31, 2008 WL 2164147, at *1 (2d Cir. 2008) (refusing to reverse conviction for failure to preserve recordings of prison phone calls); *United States v. Bielli*, 08 Cr. 381 (ADS), 2010 WL 1133862, at *2 (E.D.N.Y. Mar. 26, 2010) (rejecting motion to dismiss indictment for FBI's failure to preserve documents); *United States v. Grammatikos*, 633 F.2d 1013, 1022 (2d Cir. 1980) (refusing to reverse conviction notwithstanding government's "ill-advised destruction" of tapes). Defendant cannot meet his burden under this test.[10]

**B. Defendant's Allegations Do Not Justify the Extraordinary Remedy of Dismissal of the Indictment**

Even under the most liberal interpretation of the facts in favor of the defense, this onerous legal standard has not been met. Even assuming – as defendant suggests – the intentional destruction of recording 1D4 by SA Pena, such destruction would not warrant the dismissal of the indictment. As a preliminary matter, there are three counts in the indictment, yet there is not the slightest evidence adduced at the hearing relating to the Vilches incident in December 2006. Defendant does not even mention the Vilches incident in his brief, which alone provides grounds

[10] Defendant closes his brief by intoning that "[i]f these facts do not rise to the level of egregious bad faith criminal conduct on the part of a government agent, constituting prejudice to the defendant, it is hard to imagine what series of facts that would." (Br. at 28.) It is not difficult to imagine at all – absent the Supreme Court's explicit description in *Rochin* (which is not present here), or the involvement of governmental agents in the charged criminal activity as in *Cuervelo*, *Chin*, and *Orena* (also not present here), the defendant must meet the standard set forth above, which he does not.

to deny the motion. The Gomez incident too occurred years before the events examined at the hearing. As to the witness tampering charge, the defendant urges the Court to conclude that:

- SA Pena removed the original 1D4 recording and replaced it with a blank disk, which she disguised by forging Gaskins' handwriting (Br. at 6-9);

- SA Pena attempted to cover up her removal of 1D4 by failing to notify the prosecution team of her actions (Br. at 7), by altering the transcript of 1D5 to delete any reference to Session One (Br. at 4, 7, 8), and by attempting to conceal 1D5 recording from USAO (Br. at 8);

- SA Pena provided AUSAs and investigators with false statements about 1D4 and 1D5 and then testified falsely in court about her conduct (Br. at 4, 7, 8).

The defendant speculates that the information on 1D4 must have been so "extraordinarily damaging" to the government's case against Quinoy that SA Pena risked her career to destroy its contents and to cover her tracks. (Br. at 17, 18).

Even assuming – as the defendant urges the Court to do – that 1D4 was destroyed by SA Pena, the alleged destruction of a marginally relevant recording does not meet the legal standard for dismissal of an indictment, particularly an indictment with two other charges wholly affected by these accusations, and similarly does not entitle Quinoy, a police officer accused of assaulting restrained prisoners while they are helpless, to get a free ride for his conduct. As *Grammatikos*, which defendant relies upon so heavily (Br. at 19), explains, in assessing a claim that evidence was destroyed, the Court must take a careful look at the allegedly destroyed evidence and make "a realistic appraisal of [the] significance when viewed in the light of its nature, its bearing upon critical issues in the case and the strength of the government's untainted proof." *Grammatikos*, 633 F.2d at 1019-20. As *Grammatikos* states, to evaluate the defendant's claims regarding outrageous conduct and prejudice, the court must examine exactly what was allegedly destroyed.

As a preliminary matter, 1D5 has been produced to the defendant, in its entirety. Consequently, the only basis for defendant's argument that there was exculpatory material that was destroyed and that he cannot obtain by other reasonably available means is 1D4.

**1. Defendant Has Failed to Show There Was Destruction of Any Exculpatory Evidence on 1D4**

As noted above, Gaskins testified that when she accessed the FBIRD for 1D4, it contained three sessions: two recordings on May 22, 2008 (Session One was 118 minutes and 13 seconds; and Session Two was 24 minutes and 5 seconds); and one recording on May 24, 2008 (21 minutes and 13 seconds), which would be Session Three. (Tr. 322-23; GX 1015).

**a. Sessions One and Two of 1D4**

Hayes testified that after receiving the 1D4 recording device he went back to patrol duty, provided roadside assistance to an elderly man with car problems and also placed a brief call to his father regarding Spota. (Tr. 36). Initially, the defense argued at the evidentiary hearing that the 45-60 minutes when Hayes was recording himself on duty was exculpatory. If Hayes believed that he recorded something terribly inappropriate on 1D4, and if there was, in fact, a conspiracy between Hayes and SA Pena to destroy the evidence, then it makes no sense that they did not destroy the recording, or at least switch the recording units, when they learned about it on May 22, 2008, the day that they discussed the inadvertent over-recording and when SA Pena talked Hayes through the process of shutting off the recorder. If there was a conspiracy to destroy that conversation, then surely Hayes would not have maintained the unit for an additional two days to see if he could add another conversation to the unit, which he did when he recorded a conversation with D'Alessandro two days later. Likewise, if SA Pena believed that Hayes's

statements were so truly damning, she would have taken action to retrieve the unit and never would have instructed the technicians to download the unit to a disk on June 6, 2008.

The conclusion that the inadvertent recording of Hayes did not contain exculpatory content is supported by the content of SA Pena and Hayes' discussion captured on Session One of 1D5. On June 4, 2008, only two days before SA Pena submitted 1D4 for download, Pena delivered the 1D5 FBIRD to Hayes. Unbeknownst to them at the time, the FBIRD recorded their conversation, in which Hayes matter of factly refers to the inadvertent recording of data on 1D4, which he states was between 45 to 60 minutes long, and consisted of himself on "radio runs," plus a telephone call to his father at a Yankee game, of "at most" a minute and a half. (GX 1019A). Hayes says in 1D5 that he may have said something "inappropriate" to his father on 1D4, as he told his father about his contact with SA Pena, and his comment regarding Spota, with whom Hayes said he was still angry. (GX 1019A). It is clear from the conversation inadvertently captured on 1D5 that Hayes believed that 1D4 was still in existence, secure and undamaged in FBI custody. Further, it is clear that Hayes thought that 1D4 contained a 45-60 minute recording, with a brief (one minute and thirty second) call to his father and that the remainder of the recording was of Hayes on regular duty as a patrol officer. It is also clear from that recording that neither Hayes nor SA Pena were particularly worried about Hayes' inappropriate statement to his father. (GX 1019A).

The discussion inadvertently captured on 1D5 Session One is particularly important for what was *not* said by either SA Pena or Hayes. Indeed, contrary to what the defendant would like the Court to conclude, SA Pena and Hayes did *not* agree to destroy the 1D4 recording, did *not* state that any of the content was exculpatory to the defendant and did *not* seem to be particularly

concerned about its content.[11]

Implicitly conceding the logic of this argument, the defendant alternatively contends that SA Pena must have inadvertently recorded herself on 1D4. (Br. at 17). The defendant urges the court to conclude that the unaccounted for hour and a half from Sessions One and Two of 1D4, while the recorder was in the possession of SA Pena, was somehow critical to his defense and that he has sustained some prejudice from its destruction. (Br. at 17). Under this theory, however, the missing data likely was an inadvertent recording of the activities of SA Pena before she met with Hayes, and totally unrelated to the case.[12]

The defendant has not proffered any scenario under which SA Pena's actions in the hour before she met with Hayes is even related to the criminal charges in this case, much less exculpatory. The reason the defendant has not even ventured to guess about any potential exculpatory evidence is because there is to basis to conclude that there is any. Quinoy's uses of excessive force occurred in October and December 2006, long before the recording was made, in May 2008. Furthermore, even upon her arrival in Sleepy Hollow, when SA Pena met with Hayes, the content of their discussions was generic enough that it occurred in the presence of another FBI

---

[11] Although the defendant has not argued that the recording contained a conversation with him, it is abundantly clear that 1D4 did not contain an exculpatory conversation with Quinoy, because: (1) Quinoy has not alleged that he ever retracted his instructions to Hayes to lie in the grand jury; (2) Hayes told SA Pena in 1D5 Session One that Quinoy was no longer speaking to anyone in the department about his legal matters; and (3) there were no further recordings of Quinoy other than those that were produced to the defense, 1D1, 1D2 and 1D3.

[12] Each time an FBIRD recorder is shut off and reactivated, it records the reactivation as a new session. In all likelihood, while Hayes was attempting unsuccessfully to shut off the 1D4 recorder, he briefly succeeded in shutting it off but it started recording again, which after several failed attempts, led him to call SA Pena for advice and which led to the creation of two sessions on May 22, 2008, the day that he obtained the recorder. In fact, the FBIRD repair records indicate that the same FBIRD unit was used later that month by a different FBI agent, and that thereafter it was sent out to repair the on/off switch. (GX-1034).

agent, SA Sabric. Accordingly, casting aside the hyperbole about potentially exculpatory information on 1D4, it is clear that neither Sessions One or Two of 1D4 provides support for the defendant's motion.

**b. Session Three of 1D4**

According to the testimony of Hayes and the FBI technicians' records, session Three of 1D4 was a 24 minute inadmissible and unsworn conversation between Hayes and D'Alessandro relating to the Gomez incident.[13] (Tr. 44-45, GX 1015). Although the defendant alleges in a conclusory fashion that 1D4 must have contained "something exculpatory," other than the conversation with D'Alessandro, he fails to articulate any possible exculpatory content that 1D4 could have or might have contained. (Br. at 7 ("at the very least . . . [1D4] contained a conversation between Hayes and D'Alessandro")).

It is not entirely clear whether the Government or the Defendant is the bigger loser in connection with loss of Session Three of 1D4, as it is unclear whom the conversation would have most helped. On March 26, 2010, the Government produced as potential *Brady* material D'Alessandro's testimony in the grand jury regarding Quinoy's kick to a cuffed and restrained Gomez. (The D'Alessandro testimony is found in the court's exhibit binder, marked as GX 1044). D'Alessandro testified in the grand jury that he picked up Gomez, who had just been beaten and electrocuted over 10 times with 50,000 volts of electricity, whose hands were cuffed behind his back and who was by all accounts weakened, walked him to a police car and then lifted him, like a log, and slid him onto the plastic covered seat of the police car head first, on his belly,

---

[13] It is unclear whether or not the 1D4 recording would be discoverable and subject to disclosure by the Government, although for purposes of this motion the Government assumes that it would be discoverable because Hayes likely spoke about his own observations of the Gomez incident, which would mean that the recording was 3500 material for Hayes.

while Quinoy hoisted himself up in the air, braced himself against the doorframe, kicked his single foot directly against the bottom of both of Gomez's feet, thereby causing Gomez to slide across the plastic seat cover. GX 1044). Considering the improbability of this account, the Government respectfully submits that it is unlikely that D'Alessandro's account of the Gomez incident in 1D4, Session Three would have conformed in all respects to his grand jury testimony, and more likely would have provided the Government with material for cross-examination of D'Alessandro. On the other hand, if D'Alessandro provided the same exact account on 1D4 as he gave to the grand jury, then the recording would be a consistent statement, inadmissible in the defendant's case under Rule 801. *See Tome v. United States*, 513 U.S. 150, 58 (1995) (to be admissible under Rule 801 (d)(1)(B) the consistent statements must be made before the alleged influence, or motive to fabricate arose); *accord United States v. Zapata*, 356 F. Supp. 2d 323 (S.D.N.Y. 2005).

The defendant attempts to shift the Court's focus to the motive behind the alleged destruction, which he asserts was neither negligent nor routine. (Br. at 20.) Yet this argument overlooks the legal hurdle he faces due to the absence of proof of any potentially exculpatory material on 1D4 that the defendant does not already have. In *United States v. Solomon*, 95 Cr. 154 (LAP), 1997 WL 232523 (S.D.N.Y. May 8, 1997), for example, an INS agent intentionally destroyed evidence during trial because he realized that "he had neglected to 'log in' certain other items," and, "fearing that he would get in trouble for his oversight," began tearing up documents and fed some into a shredder. *Id.* at *1. The Court nevertheless denied defendant's motion to dismiss the indictment because "while the destruction of the documents was deliberate, and therefore reprehensible," there was neither any indication that the evidence possessed any

exculpatory value, nor was it impossible for the defendant to obtain comparable evidence by other means. *Id.* at *2-3; *see also United States v. Morganstern*, 933 F.2d 1108, 1116 (2d Cir. 1991) (district court properly denied motion to dismiss indictment for destruction of evidence because evidence not exculpatory); *United States v. Baron et al.*, 92 Cr. 898 (TPG), 1996 WL 551625, at *5 (S.D.N.Y. Sept. 27, 1996) (denying motion to dismiss indictment based on missing tapes because "[t]he tapes' exculpatory value to [defendants] is not readily apparent"); *Alvarez v. Hoke*, CV-88-3991, 1989 WL 80030, at *4 (E.D.N.Y. July 12, 1989) ("The mere possibility that evidence might aid the defense does not satisfy the constitutional materiality standard."). In any event, even if the 1D4 discussion with D'Alessandro was exculpatory, it was nevertheless cumulative, because the Government has already provided the defendant with the exculpatory portions of D'Alessandro's sworn grand jury testimony.

**2. The Allegedly Exculpatory Material Can Be Obtained by Other Means**

Regardless of whether or not there were exculpatory statements by D'Alessandro on 1D4, Session Three, the defendant's motion fails for the independent reason that the substance of D'Alessandro's statement can be obtained by other means. Indeed, as mentioned above, defendant already has the exculpatory portions of D'Alessandro's grand jury testimony on the topic. The defendant has known since October 2006 that D'Alessandro witnessed the Gomez incident, knows how to find D'Alessandro, has been alerted to the (possibly) helpful portion of D'Alessandro's statements, and has the statements in a sworn version that is more useful that the inadmissible unsworn recording of 1D4. Further, D'Alessandro is a witness available to both the defendant and the Government at trial.

Courts routinely have rejected claims of outrageous government conduct in circumstances like those presented here, where the defendant relies upon purely speculative allegations regarding the content and prejudice arising from the allegedly destroyed evidence and where the witness captured on the tape is available to be called as a witness by both the government and the defense. *See Trombetta*, 467 U.S. at 490 (no due process violation where record lacks evidence of a calculated effort to circumvent *Brady* obligations or of a conscious effort to suppress exculpatory evidence and where defendant could obtain testimony through other means); *Youngblood*, 488 U.S. at 58 (failure to preserve potentially helpful evidence does not constitute a denial of due process); *United States v Mendoza-Morales*, 2008 WL 2311409 (D. Or. 2008) (content of destroyed notes could be recreated substantially through an examination at trial of those with knowledge of their contents). In *Olszewski v. Spencer*, 369 F. Supp. 2d 113 (D. Mass. 2005), for example, the defendant argued in a habeas petition that his due process rights had been violated by the intentional destruction of an exculpatory statement. Concluding that the statement was both exculpatory and its destruction intentional, the district court nonetheless rejected the defendant's constitutional due process claim, because the defendant could not establish that comparable evidence could not be obtained by other reasonably available means. *See id.* at 127 (citing *Trombetta*, 467 U.S. at 489).

In this case the facts are even more compelling. The only potential exculpatory content in 1D4 recording is the unsworn statement of D'Alessandro, a witness who is available for the defendant to question at trial. Assuming, *arguendo*, that the conversation was exculpatory, the defendant can call D'Alessandro as a trial witness, the defendant has D'Alessandro's exculpatory (although incredible) sworn grand jury testimony which he can use for impeachment purposes,

and the defendant can fully explore what D'Alessandro has to say about the Gomez incident. Accordingly, because there is no constitutional violation resulting from the missing 1D4 recording, and because Quinoy can substantially recreate the missing evidence, his motion necessarily fails.

## POINT TWO

## THE GOVERNMENT SHOULD NOT BE SANCTIONED

Although defendant makes no mention of any lesser sanction short of dismissal of the indictment in his papers, in its Order of May 24, 2010, the Court indicated that it would consider arguments regarding spoliation. The Government respectfully submits that the imposition of sanctions is not warranted in this case. The defendant allegedly committed very serious crimes, including witness tampering and the abuse of his authority as a police officer, by beating defenseless and restrained civilians, conduct that was uninfluenced and unaffected by D'Alessandro's statements on 1D4. Recognizing that 1D4 is not available, however, the Government is willing to enter into a stipulation regarding D'Alessandro's statements on May 24, 2008, which will put defendant in exactly the same situation he would be in if 1D4 still existed. Accordingly, the is imposition of sanctions is not warranted.

### A. The Legal Standard

The determination of whether the Court should impose a lesser sanction than dismissal of the indictment, and what that sanction should be, is similar to the determination of whether the indictment should be dismissed. To obtain a lesser sanction than dismissal, the following factors must be found: (1) "that the loss of the evidence at issue is properly charged to Government"; (2) "that the failure to preserve the evidence was motivated by bad faith or ulterior motives"; and (3)

"the defendant must show that the lost evidence would have been exculpatory and there is no comparable evidence available." *Bin Laden*, 2001 WL 30061, at *5 (citing, *inter alia*, *Trombetta*, 467 U.S. at 489; *Rahman*, 189 F.3d at 139; *Buie*, 923 F.2d at 11). "Bad faith," moreover, is limited to "situations in which the government knew of the exculpatory value of the evidence when it was destroyed." *United States v. Bakhtiar*, 994 F.2d 970, 975 (2d Cir. 1993) (rejecting claim that government's negligent destruction of tape-recordings deprived defendant of a fair trial); *see also In re Terrorist Bombings of U.S. Embassies in East Africa*, 552 F.3d 93, 148 (2d Cir. 2008) (defendant "pointed to no evidence that the tapes were intentionally destroyed, and therefore the destruction of the tapes could not have amounted to spoliation"). Defendant cannot meet this standard because, as discussed in Point One above, the substance of D'Alessandro's statements can be substantially recreated by the defendant. *See, e.g.*, *id.* at 147-49 (rejecting sanctions for failure to preserve tapes because defendant could introduce "substitute evidence," such as summaries or stipulations concerning the content of statements on missing tapes); *United States v. Shine*, 2:05 CR 25, 2007 WL 2745351, at *5-6 (D. Vt. Sept. 19, 2007) (rejecting motion to dismiss indictment based on destroyed evidence because comparable evidence was available).

Further, even if the defendant were entitled to the imposition of sanctions, under this approach the appropriate sanction for any potential spoliation in this case is one that already has been offered by the Government. 1D4 contained an inadmissible statement by D'Alessandro, a witness who testified in the grand jury that he did not see Quinoy kick Gomez in the head in the back of the police car. According to the testimony of Hayes, D'Alessandro repeated that statement in the conversation of 1D4. The Government is prepared to stipulate, without conceding the admissibility of the D'Alessandro statement, that 1D4 would have contained a

consistent statement by D'Alessandro to Hayes on May 24, 2008, namely, that on October 17, 2006, he placed Gomez, head first, into the back of a SHPD car and that he did not observe Quinoy kick Gomez in the face. This potential stipulation puts the defendant in exactly the same position that he would have been if the 1D4 recording still existed, with a prior consistent statement of limited evidentiary value, and mitigates against the imposition of sanctions.

**B. The Tape-Recorded Conversations of Quinoy Should Not Be Suppressed**

There is no basis in this record for the suppression of recordings 1D1, 1D2, and 1D3. *See, e.g.*, *United States v. Bufalino*, 576 F.2d 446, 449 (2d Cir. 1978) (affirming denial of motion to suppress tapes, even though FBI agent deliberately destroyed back-ups of tapes, because "'there is no reason to believe' that any such supplementary material 'would have been favorable to the defense'") (quoting district court); *United States v. Dalisay*, 03 Cr. 1305 (JGK), 2005 WL 1176115, at *8-9 (S.D.N.Y. May 17, 2005) (denying motion to suppress all evidence relating to Federal Express package containing hidden narcotics even though package itself was destroyed because "[t]here is no evidence that having the physical contents of the Federal Express package available for trial would be useful to the defendant"); *compare United States v. Yevakpor*, 419 F. Supp. 2d 242, 245-46 (N.D.N.Y. 2006) (suppressing entire videotape because 22 of 25 minutes of relevant portions were missing), *with United States v. Codrington*, 07 MJ 118 (CLP), 2008 WL 1927372, at *12-14 (E.D.N.Y. May 1, 2008) (rejecting *Yekavpor* analysis because missing portions of videotape were irrelevant). Indeed, defendant does not challenge these recordings at all in his brief. Nor could he: the evidence at the hearing demonstrated that the FBI technicians' contemporaneous documentation of the contents of these recordings exactly match the recordings that were produced to the defendant, in terms of number, order, and length of each session. Hayes

confirmed in his testimony that the content of these recordings was consistent with his recollection of the conversations. (Tr. 13-34). Accordingly, there is no basis to conclude that any impropriety relating to 1D4 somehow retroactively infected recordings 1D1, 1D2, and 1D3, which defendant has had for almost one year.

**C. There Is No Basis for An Adverse Jury Instruction Against the Government**

Moreover, because of the speculative evidence that exculpatory materials were lost, an instruction that the jury could draw an adverse inference based on the failure to preserve such evidence is not appropriate. *See United States v. Nichols*, 912 F.2d 598, 603 (2d Cir. 1990) (speculation that lost evidence would have been of benefit to the defense insufficient to warrant adverse inference instruction); *see also, e.g.*, *United States v. Wise*, 221 F.3d 140, 156 (5th Cir. 2000) ("adverse inference drawn from the destruction of records is predicated on bad conduct" and district court "properly declined to instruct the jury on the issue of spoliation of the evidence" where there was "no evidence of bad faith conduct by the government"); *United States v. Flores*, 63 F.3d 1342, 1363 (5th Cir. 1995) (mere "unfocused speculation" not enough to show "government violated its duty to preserve evidence that might have exculpated" defendant); *Higgins v. Martin Marietta Corp*., 752 F.2d 492, 496 (10th Cir. 1985) (absent a showing of bad faith, failure to produce records is insufficient to warrant a spoliation or missing evidence instruction); *cf. United States v. Thristino*, 47 Fed. Appx. 7, 9 (2d Cir. 2002) (counsel's failure to seek jury instruction relating to lost evidence was excusable, as no proof that missing evidence would have been useful to the defense); *Jeremiah v. Artuz*, 181 F. Supp. 2d 194 (E.D.N.Y. 2002) (not ineffective assistance to fail to request adverse inference charge in New York state trial where no evidence of bad faith in connection with officer's destruction of notes). Indeed, the district

court in *Nichols* instructed the defendant to supply an affidavit attesting to the content of the missing evidence before the court would even consider a jury instruction relating to the missing evidence. *See Nichols*, 912 F.2d at 603. In this case, defendant has failed to supply such an affidavit, which is all the more reason the motion should be denied.

**POINT THREE**

**DEFENDANT SHOULD BE PRECLUDED FROM RAISING AT TRIAL HIS ALLEGATIONS OF GOVERNMENT MISCONDUCT**

For all of the reasons set forth above, the Court should preclude defendant from raising any arguments, in jury addresses or cross-examination of witnesses, pertaining to improper government conduct.

The Second Circuit has uniformly held that claims of government misconduct must be made to, and resolved by, the Court and cannot be presented to the jury: "A motion to dismiss an indictment on account of outrageous government conduct is directed to the court rather than the jury." *United States v. Regan*, 103 F.3d 1072, 1082 (2d Cir. 1997) (holding that the district court correctly precluded the defendant from arguing that his prosecution was improperly motivated); *id.* at 1082 ("the selective prosecution defense is an issue for the court rather than the jury"); *United States v. Nunez-Rios*, 622 F.2d 1093, 1098 (2d Cir. 1980) ("the defense of outrageous Government conduct is not for the jury to consider, but must be decided by the trial court"); *see also United States* v. *Jones*, 52 F.3d 924, 927 (11th Cir. 1995) (same); *United States* v. *Washington*, 705 F.2d 489, 495 (D.C. Cir. 1983) (same); *United States* v. *Taleb-Jedi*, 566 F. Supp. 2d 157, 185 (E.D.N.Y. 2008) (citing *Nunez-Rios*) ("A claim of outrageous government conduct is one for a court to decide"); *United States* v. *Collins*, 755 F. Supp. 110 (S.D.N.Y. 1991) (citing *Nunez-Rios*) (deciding as a matter of law a claim of outrageous government conduct where an

informant arranged the sale of a firearm to a government agent); *United States* v. *Bertoli*, 854 F. Supp. 975, 1076-77 (D.N.J. 1994) (precluding defense from asserting selective or vindictive prosecution claim at trial because "[c]ase law definitively establishes that questions of vindictive prosecution and Government misconduct are not proper questions for the jury to consider").

The reason for this rule is compelling. A claim of governmental misconduct "is not a defense on the merits to the criminal charge itself, but an independent assertion that the prosecutor has brought the charge for reasons forbidden by the Constitution." *United States* v. *Armstrong*, 517 U.S. 456, 463 (1996). The claims are totally "unrelated to factual innocence of the crime charged" — the sole issue to be decided by the jury — and, as a result, they must be put to and resolved by the court alone. *Regan,* 103 F.3d at 1082. Indeed, the Second Circuit has criticized one district court for admitting evidence relating to the propriety of the government investigation because "it served as a ploy for turning the trial away from a determination of whether the elements of the offense charged had been proved beyond a reasonable doubt into a wide-ranging inquiry into matters far beyond the scope of legitimate issues in a criminal trial." *United States v. Rosado*, 728 F.2d 89, 93 (2d Cir. 1984); *see also Regan*, 103 F.3d at 1082 (noting district court's error in *Rosado*).

A defense that seeks to change the subject from whether the defendant is innocent to whether the Government engaged in misconduct would only invite jury nullification. Yet jurors have no right to nullify and the trial judge has an affirmative duty to prevent nullification. *See United States v. Thomas*, 116 F.3d 606, 615 (2d Cir. 1997) (jury nullification is "by no means a right or something that a judge should encourage or permit if it is within his authority to prevent"); *id.* at 614 ("We categorically reject the idea that, in a society committed to the rule of

law, jury nullification is desirable or that courts may permit it to occur when it is within their authority to prevent"); s*ee also Washington*, 705 F.2d at 489, 494 ("A jury has no more 'right' to find a 'guilty' defendant 'not guilty' than it has to find a 'not guilty' defendant 'guilty.'"); *cf. Sparf and Hanson v. United States*, 156 U.S. 51, 102 (1895) ("Public and private safety alike would be in peril if the principle be established that juries in criminal cases may, of right, disregard the law as expounded to them by the court, and become a law unto themselves."). Any argument or examinations raising the assertion of government misconduct in this case would be irrelevant to the only issue properly before the jury (the defendant's innocence or guilt), would create a time-consuming distraction, and would encourage the jury to make a decision on an improper basis — that is, to nullify an otherwise just verdict.

Applying these principles, the Government respectfully requests that the Court preclude the defense from calling SA Pena as a witness to testify about this topic, as the sole purpose for such would be to imply that government misconduct occurred, an issue totally unrelated to the factual innocence (or lack thereof) of the defendant. SA Pena was obviously not present during Quinoy's use of excessive force against: Mario Gomez on October 17, 2006; Luis Vilches on December 17, 2006; against Jose Rivera on August 7, 1999; nor Quinoy's efforts to tamper with Michael Hayes' testimony. Similarly, the Court should preclude any questioning of Michael Hayes to suggest that he had any role in the destruction of evidence. Defense counsel may, however, appropriately examine Hayes (indeed, any witness) as to whether that witness is being truthful and whether that witness is testifying based upon his or her own recollection of events. Whether or not questioning is appropriate with regard to Hayes' conversation with D'Alessandro depends, in part, on whether D'Alessandro testifies at trial and what testimony he provides. Any

argument or examination suggesting that recordings were somehow improperly handled, however, is a claim of governmental misconduct that does not belong before the jury once it has been addressed by this Court.

**CONCLUSION**

For the reasons stated above, defendant's motion should be denied in its entirety, and the Court should preclude defendant's claim of outrageous conduct at trial.

Dated: White Plains, New York
June 4, 2010

Respectfully submitted,

PREET BHARARA
United States Attorney

By: __\s\ Cynthia K. Dunne____________________
CYNTHIA K. DUNNE / DAVID J. KENNEDY
Assistant United States Attorneys
300 Quarropas Street, 3rd Floor
White Plains, NY 10601
Tel. No.: (914) 993-1913

# GX 1035 (color)

Draft

**UNITED STATES DEPARTMENT OF JUSTICE**
**FEDERAL BUREAU OF INVESTIGATION**
**NEW YORK, NEW YORK**

FILE NUMBER: **282A-NY-298625**

DATE: 6/4/2008

MONITORING AGENTS: SA Catherine Pena / C-20

Tape: 1D5

PARTICIPANTS: Cooperating Witness (CW)
~~Detective Jose Quinoy~~
Michael Gasko
~~Unknown Male (UM)~~
~~Unknown Female (UF)~~

ABBREVIATIONS: (UI) - UNINTELLIGIBLE
(IA) - INAUDIBLE

saved as: 73630..SA Pena..dap

CW- DRAFT

GOVERNMENT EXHIBIT
1035-color
09 cr. 424 (KMK)(ID)

105

282A-NY-298625

This is Special Agent Catherine Pena. Today's date is June 4, 2008. This recording device is going to be turned off and given to a Cooperating Witness (CW) until such time as that Cooperating Witness can have consensually recorded conversations with the subjects of a civil rights violation case.

**WAV #1**

CP: Test, test, test, hey sorry just wanted to (UI)

CW: I asked my father about that name.

CP: Okay

CW: He doesn't recognize it.

CP: No actually you know what

CW: But he said, he said there's been so many people since (UI) been married that's been in and out of upstairs and so many other places that

CP: Uh Sleepy Hollow, part of the Sleepy Hollow coalition. Does that mean anything. Sleepy Hollow coalition.

CW: The coalition is what the mayor ran under the Republican Party 10 ten years ago.

CP: Oh

CW: He was part of to get the Democrats out 10 years ago.

CP: Okay, okay no problem (UI) do this (UI) meeting outside of town

CW: Yeah

CP: Uh (UI) is denying in questioning and he's really bad liar but he's genuinely perplexed at that question from me like, like you're telling the

282A-NY-298625

---

**WAV #2**

UM: (UI)

CW: Yeah my lawyer's telling him I gotta give him a date. I gotta find a date to give (UI)

Gasko UM: To give who.

CW: They wanna know what day I wanna come back so my lawyer's pressuring me to give him a date so he can call them back.

Gasko UM: I have a feeling (UI) is (UI) we had nothing to do with it.

CW: Have you talked to Tom about this. You (UI) talk to (UI)

Gasko UM: Oh he knows in general (UI) discuss anything with him.

CW: Why's that.

Gasko UM: No I'm just saying I don't. He asked me if (UI) and I said no. That's it. Why have you talked to him (UI)

CW: No. Have you heard anything about Barry. (UI) did he go down.

Gasko UM: I know he was supposed to but he didn't.

CW: The rumor is he's cooperating with them out on the street.

Gasko UM: Who told you that?

CW: Out on the street if you listen to all the chit chat out there.

Gasko UM: What (UI) like the Fireman

282A-NY-298625

CW: No, have you talked to him?

Gasko UM: (UI) I don't think he went

CW: (UI) yet. (UI) about anything. You don't know IF he went when was the last time you talked To Quincy

Gasko UM: (UI) ~~talk~~ to me (UI) He talked Today about my CI

CW: I thought you were gonna ~~be (UI) to accounting or whatever.~~ give your CI up to county

Gasko UM: Well no, no, they're they're coming ~~in (UI)~~ For it but

CW: Oh alright.

Gasko UM: I'll still get the arrest. (UI) need the county ~~(UI)~~ meet the county Detective

CW: That's it.

Gasko UM: Fuck that ~~(UI) don't~~ bro, I'll even go to fucking (UI) Briarcliff

CW: No

Gasko UM: ~~(UI)~~ That bad job you make a fucking lot of money, you're treated with fucking respect out on the fucking street, they like to see you there, you know, (UI) people waiting for the cop when he's doing the crossing, not fucking fucking dick and shit like that that's what I heard, that's what I heard on the street (UI) which I don't even know what other ~~(UI)~~ things are because it is what it is (UI) do (UI) him who knows

Gasko ~~CW~~: I doubt that, I doubt that. There's gotta be something severe.

Gasko UM: (UI) start being nice to Frank ha, ha, ha

CW: Why's that.

Gasko UM: ~~(UI)~~ He the next chief

CW: I don't think so. I think they're gonna go out of the village for the next



A4 (color)

chief. They have to. It's gonna be the smartest thing to do.

Gasko UM: ~~(UI)~~ he got two years before his son UI for sergeants Exam

CW: Oh my God.

Gasko UM: Why you don't think that's gonna happen. (UI) Detective or sergeant first.

CW: Detective. You haven't heard so you haven't heard (UI) Barry ~~(UI)~~ Yet have you.

Gasko UM: Might be a ~~slow (UI)~~. spota ism

CW: What's that.

Gasko UM: Might be a ~~slow (UI)~~. spot aism

CW: Why do you say that?

Gasko UM: Who else would that come from. Can't have the gym downstairs I know that.

CW: Why.

Gasko UM: Fire Department wants nothing to do with the Police Department. Did you talk to Johnny (UI)

CW: Nope.

Gasko UM: Who you talk to from the Fire Department?

CW: Just my brother, just Jimmy and he's getting ready to quit.

Gasko UM: That's all you talked to in the whole Fire Department.

CW: Uh huh that's it. I mean and Ray but Ray's ~~(UI)~~ ~~but Ra~~ not in the Fire Dept any more

Gasko UM: You don't talk to Todd?

282A-NY-298625

CW: Not any more. I used to. Not any more.

Gasko UM: Why he didn't stick up for you.

CW: No it has nothing to do with that. He just started asking me questions one day about, about this the stuff going on in here and I got a little nerve racked at him.

Gasko ~~UM~~: Well Todd hates him.

CW: Todd hates who?

Gasko UM: ~~Jim~~. Jimmy

CW: Yeah

Gasko ~~UM~~: I heard that, didn't you. I thought you told me that.

CW: I've heard that. Honestly, I don't talk to him any more whatever.

Gasko UM: No ~~I (UI) Jim~~, what do you need? (UI) guy's gonna go for it. I asked willy. whats the story with us using the gym.

CW: ~~(UI) express card~~. Join New York sportsclub

Gasko UM: You know I really wanted it fucking because the convenience. Like right now (UI)

CW: No it would be convenient. I could bring Jimmy in and run downstairs and work out for an hour. There's a way around it. Join the Ambulance Core.

Gasko UM: No (UI)

CW: And then you could use the gym. But they're gonna give you grief about that too probably

Gasko UM: Why.

CW: They will. They'll find a reason. They don't like us (UI) for some reason

anymore. I don't know what (UI) since I quit (UI) I have no idea what's going on (UI). You tell Barry about my dad's retirement party.

Gasko UM: Yeah he knows about it.

CW: Is he coming or what.

Gasko UM: Barry, for 40 bucks all you can eat and drink.

CW: The caterer just called my freakin mom back today said she can't, he can't do it.

Gasko UM: (UI) somebody was telling me that they got somebody. (UI) you telling me.

CW: No, yeah we had somebody.

Gasko UM: (UI) saying maybe Vinny knows somebody.

CW: Maybe well we were gonna go

Gasko UM: (UI) upstate (UI) actually

CW: Yeah, we were gonna go to uh (UI) and Brian but they don't do uh barbeque so my brother's girlfriend has a, has a lady so she called today and she's gonna get back to him tomorrow. (UI) guy called back up and said he, he over-booked cause he has 2, 2 or 3 retirement parties going that day from FDNY.

Gasko UM: Jimmy rented the chairs (UI)

CW: Yeah no he called the people up. They're gonna call him back tomorrow with a price but I just told him go ahead and do it.

Gasko UM: Yeah they're cool. They come there and fuck (UI) set every thing up.

CW: They do tents too.

282A-NY-298625

Gasko UM: ~~Tanks.~~ Tents

CW: Tents, tents.

Gasko UM: Tents yeah.

CW: Alright cause he, no the guy has two tents but he's got, I don't know, I might send him up but we gotta see if he has all the poles for them. It might just be easier to get them

Gasko UM: Yeah fuck it.

CW: Might be easier to just pay for the tent too.

Gasko UM: So who's doing this for you, just you and Jimmy.

CW: No, Dan, Jimmy just doing the table and chairs, Danny, me Danny and my mom are doing this.

Gasko UM: How many people you expect?

CW: ~~(UI)~~ what did Barry get?

Gasko UM: About 100.

CW: (UI) figure like 70, 75 give or take. My dad will probably get all, all the retired guys.

UM ~~UM~~: (IA) voice from radio speaking

CW: So you ever talk to Q about this whole thing going on. Has he asked you.

Gasko UM: He's pretty relaxed.

CW: I don't know. I haven't seen him. He's relaxed.

Gasko UM: He doesn't seem to be sweating it. You know what I mean, he's been like status quo so (UI) really ask him anything. Wonder if ~~(UI)~~ there going to talk to him.?

CW: What's that say. He's asking the wrong guy bro.

UM: No I'm just saying, I'm wondering. I don't think Q would be dumb enough to bring it up with me you know what I mean cause (UI) discuss something that I you know what I mean, (UI) you know what I mean

CW: Yeah

UM: You know what I mean I'm not gonna discuss (UI) you know what I mean it's like you I'm not gonna sit there and ask you what to say, (UI) say, you know what I mean.

CW: No I know, wouldn't expect you too either.

UM: It's not. No it's not, that's the conspiracy shit where people fucking jam themselves up with fucking talking about getting their stories straight and shit, that shit don't work. (UI) fucking (UI) this weekend.

CW: It's not worth it. All the paperwork you gotta fill out.

UM: (UI) 3 hours

CW: Hey, did, did, did Junior get written up for uh (UI) too.

UM: I have no idea. Not that I've heard.

CW: Has any, did anybody else do anything like that or anything that he's done ever get written up.

UM: (UI) my personal vehicle in (UI) pay for (UI)

CW: So how come he's not paying for (UI) she's done (UI) cars.

UM: Cause he was on duty, I wasn't. So it would of went through my insurance company anyway. Irritating to you isn't it?

CW: Yeah no it is irritating.

UM: It's his son bro. What do you expect. Did you think anything different. Did you really?

CW: Huh. Not really.

UM: So why everybody so surprised. Well he's getting this, he's getting that. It's his son. He goes down writes the tickets and does what he has to do and gets rewarded.

CW: Yeah but look at Wendy.

UM: Wendy goes out and writes a fucking 100 fucking parking tickets a month now.

CW: Yeah and they think that's a good cop. C'mon if anybody else was out on the street with a video camera we'd of been modified and suspended or at least modified.

UM: It's his candy shop bro.

CW: He ain't doing a very good job running it.

UM: All we have to do is go in there and fucking (UI) checks (UI) what the fuck (UI) there's nothing we can do about it.

CW: No there isn't.

UM: (UI) think about it, his thing is data for schools and everything else. That's his thing with the data. I haven't been to a fucking school yet. (UI)

CW: (UI) that's a quota system though.

UM: Bro lemme tell you something. Okay now listen to me if somebody goes (UI) school comes up and he sends somebody for me and I don't go

CW: What if he sends, what if he sends me.

UM: They I'll be fucking pissed.

CW: Why, my (UI) is up there. It's pretty good.

UM: Yeah well who's got the most drug arrests in the department, in the department

CW: You got (UI)

UM: I got weed, I got PCP, I got crack, I got cocaine

CW: Mike they don't want that here

UM: Well what I'm getting at

CW: They don't (UI)

UM: Why, well wait a second though. Explain to me what makes somebody else more qualified to go to a drug school then me.

CW: He doesn't, they don't want it Mike. I'm not saying you're not qualified. I'm just saying that's not what he wants cause you're out there doing your job locking up people he's trying to protect on the street and that's not what he wants. He wants you to come in and be status quo that's all he wants, he wants, he wants you to write 300 parking tickets for the month and that's it and then if you don't write your 300 parking tickets it's well you can't go to school cause you didn't write them.

UM: When I brought him PCP here nobody even knew what it was that night. I was like it's dust, what's that, PCP.

CW: C'mon his son writes 79, 79 parking tickets and only 7 movers a month but yet that's a good cop.

UM: (UI) fucking unfucking believable. What was mine last month?

CW: 28

UM: What was yours?

CW: 31

UM: Oh shit

CW: Can you believe, can you believe I have two felony collars, they're only worth 6 beta points but because I have a Quality of Life which is a double parker I get 8 points.

UM: Yup on Beekman, Cortland or (UI)

CW: Can you believe that. That is unbel, that is unheard of.

UM: It's his candy shop

CW: And he's running it, it's disgusting the way

UM: Look at (UI) look at how many parking tickets Wendy wrote

CW: Oh yeah because look who trained her. She's just like her, she's just like Jimmy, Jr.

UM: 17 she got last month?

CW: No last month she got a point 61. She didn't write any, she didn't write any VT, VTO's but she wrote all parking tickets. Look at him, he's the same exact way

UM: She doesn't have arrests since she's been on her own.

CW: No she hasn't had an arrest since she's been on her own. Look what, what are you gonna expect. Are you gonna expect her to lock up her friends and relatives out on the street? She knows everybody down there Mike. Wasn't it you who told me she called you and the guy blew (UI) in her face

UM: (UI)

CW: And what was her excuse for that. Jimmy told her not to lock people up down there or get involved in anything.

282A-NY-298625

UM: No (UI)

CW: I mean c'mon.

UM: (UI) said she didn't understand, I don't know.

CW: She understood quite well.

UM: Man I really suck.

CW: No you don't, Mike if you were down in New York City these would be good numbers right here. If this was a precinct in New York City these would be good numbers right here

UM: (UI) arrests

CW: 11 parkers, 3 movers and 2 arrests for the month. That be great numbers.

UM: 3 felonies

CW: Yeah I have 3 felonies.

UM: What else.

CW: I had a gun collar (UI) good job.

UM: Yeah well that's (UI) I (UI) some coke

CW: Yeah

UM: (UI) fucking took the whole fucking thing off and everything (UI)

CW: But it's not like I'm looking for a freakin praise every time I make a collar cause I'm doing my job but whatever

UM: Yeah he's up to every month.

CW: Yup every month he's up there (UI) you know nobody, nobody's leaving

this job cause the money sucks, everybody's leaving this job because the police chief sucks and because we're (UI)

UM: (UI) got a deal for the month of February

CW: What about the month of May (UI) go to uh, go to Richie (UI)

UM: (UI) he's going to a lot of (UI) point (UI)

CW: Yeah go to Richie. Hasn't written anything since he got off FTL.

UM: (UI)

CW: (UI) detective still in the office and he's a detective making one collar for the year

UM: (UI) just beat me by one arrest

CW: Summertime not even here yet Mike. Just give it a chance. I think it's disgusting that we don't have a supervisor working tonite. No wonder why we're the laughing stock in the county. I can't believe he's charging these like 16 year old kids with felonies, 14 year old kids what an ass.

UM: (UI) is 74 (UI)

CW: Why is there another lieutenant's position opening?

UM: Uh, (UI) damn look at him, every fucking month

CW: Even in April. Even in April.

UM: But all he does is bitch.

CW: That was (UI) what's that.

END OF CD/CONVERSATION

# GX 1044

Quinoy?

A. Yes.

Q. Okay. And at this time you headed towards the car?

A. Yes.

Q. Whose car?

A. Officer Hayes' patrol car was in front of mine. When he pulled up, he was in front of me. My car was blocked.

Q. And your plan was to put him in the back seat of the car?

A. Yes.

Q. Is the car door opened?

A. No.

Q. Who opened the car door?

A. I believe it was Ebel. I'm not sure. I'm really not sure.

Q. Okay. So you don't remember who opened the car door?

A. No, I don't remember.

Q. But you and Quinoy are walking him to the car?

A. Yes.

Q. And by this point, did you know

GOVERNMENT EXHIBIT 1044 09 cr. 424 (KMK)(ID)

anything about the incident, or why --
A. No. I knew when we picked him up that it was Mr. Gomez, but prior to that, I didn't know who it was.
Q. You didn't know what the scuffle was about?
A. No, I had no idea.
Q. And you go to put him into Officer Hayes' car?
A. 502.
Q. And he is moderately compliant as you're coming up to the car?
A. No, at that point he was still very agitated.
Q. He was very agitated at this point?
A. Yes. What happened was we pushed him into the car.
We have plastic seats in the back of our cars, with plastic door panels, so it's like a smooth plastic, a hard plastic. So we slid him in, and he was kicking at the door, to get the door -- to stop it from closing.

R. D'Alessandro - 9/15/08

Q. You slid him in?
A. We slid him in head first.
Q. Head first. On his stomach?
A. I believe so, yes.
Q. So his arms are cuffed behind his back?
A. Yes.
Q. You put him in head first, on his stomach?
A. Yes.
Q. Across the back seat?
A. Yes.
Q. Well, how could he get his body across the back seat if his hands are behind his back, he's going in head first?
A. Because you could slide him -- it's plastic, it's hard plastic, you can slide him in.
Q. So he can slip across the back, is what you're saying?
A. Yes.
Q. And his feet are still sticking out the door?
A. Correct.

R. D'Alessandro - 9/15/08

Q. And at that point, what happened next?

A. So his feet are outside the door. We couldn't get the door closed.

Quinoy takes his foot, pushes against his feet, holding onto the door frame, and he slams the door shut.

Q. So Quinoy, he's holding his body up by holding the door?

A. The door frame.

Q. He brings his body up in the air and kicks him in with his feet?

A. Pushes him in with his foot.

Q. Okay. So to get him to slide across this slippery slide of a back seat, he hoists himself in the air and pushes him with his feet?

A. He just grabbed the door frame and pushed against his feet to get him in.

Q. And he pushed with one foot or with both of his feet?

A. One foot.

Q. So he pushed with one foot, bracing himself with the door?

A. Correct.

Q. Did you see what part of Gomez's body met contact with Quinoy's feet?

A. Yes. They connected both feet.

He put his feet against -- Detective Quinoy put his feet against Gomez's feet, and pushed him in far enough, and then slammed the door shut.

Q. Did you see Quinoy kick him in the face?

A. Never.

Q. Were you looking at all times while Gomez was getting in the car?

A. Yes. I was on the left side, so he was over here.

So as we got up to the car, obviously, the door is there, so you know, I'm pushing him up by his belt to slide him in, and then his feet are hanging out, and he goes to close the door, the door is not shut. And he pushes his feet and then slams the door shut.

Q. And Quinoy, basically his feet are resisting, is that what you're saying,

R. D'Alessandro - 9/15/08

his feet are still kicking?

A. Yes, his feet.

In other words, he didn't pull his feet in, so we could close the door. His feet were dangling outside.

And every time you go to close the door, he's not moving his feet in, so you can shut it.

So he pushes his feet in and then slams the door quickly, so that he's not going to stick his feet back out.

Q. And just so that we're clear, you didn't see him kick Quinoy in the face?

A. Kick him what?

Q. I'm sorry, kick Gomez in the face.

A. No, I never saw that.

Redacted

CERTIFICATE OF SERVICE

Connie Jones-Hairston deposes and says that she is employed in the Office of the United States Attorney for the Southern District of New York.

That on June 4, 2010, she e-mailed a copy of the **Government's Memorandum of Law in Opposition To Defendant's Motion To Dismiss the Indictment** in United States v. Jose Quinoy S1 09 Cr. 424 (KMK) by e-mail:

QFMlaw@aol.com

I declare under penalty of perjury that the foregoing is true and correct. 28 U.S.C. § 1746.

Connie Jones-Hairston

Executed on: June 4, 2010
White Plains, New York